**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROCKY MOUNTAIN FARMERS UNION;
REDWOOD COUNTY MINNESOTA
CORN AND SOYBEAN GROWERS;
PENNY NEWMAN GRAIN, INC.; REX
NEDEREND; FRESNO COUNTY FARM
BUREAU; NISEI FARMERS LEAGUE;
CALIFORNIA DAIRY CAMPAIGN;
GROWTH ENERGY; RENEWABLE
FUELS ASSOCIATION; AMERICAN
FUEL & PETROCHEMICAL
MANUFACTURERS ASSOCIATION,
FKA National Petrochemical &
Refiners Association; AMERICAN
TRUCKINGS ASSOCIATIONS; CENTER
FOR NORTH AMERICAN ENERGY
SECURITY; THE CONSUMER ENERGY
ALLIANCE,
                      *Plaintiffs-Appellees*,

                 v.

RICHARD W. COREY, in his official
capacity as Executive Officer of the
California Air Resources Board;
MARY D. NICHOLS; DANIEL
SPERLING; KEN YEAGER; DORENE
D'ADAMO; BARBARA RIORDAN;
JOHN R. BALMES; LYDIA H.
KENNARD; SANDRA BERG; RON

No. 12-15131

D.C. Nos.
1:09-cv-02234-
LJO-GSA
1:10-cv-00163-
LJO-DLB

ROBERTS; JOHN G. TELLES, in his official capacity as member of the California Air Resources Board; RONALD O. LOVERIDGE, in his official capacity as member of the California Air Resources Board; EDMUND G. BROWN, JR., in his official capacity as Governor of the State of California; KAMALA D. HARRIS, Attorney General, in her official capacity as Attorney General of the State of California,
                    *Defendants-Appellants*,

ENVIRONMENTAL DEFENSE FUND; NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB; CONSERVATION LAW FOUNDATION,
    *Intervenor-Defendants-Appellants*.

---

ROCKY MOUNTAIN FARMERS UNION; REDWOOD COUNTY MINNESOTA CORN AND SOYBEAN GROWERS; PENNY NEWMAN GRAIN, INC.; REX NEDEREND; FRESNO COUNTY FARM BUREAU; NISEI FARMERS LEAGUE; CALIFORNIA DAIRY CAMPAIGN; GROWTH ENERGY; RENEWABLE FUELS ASSOCIATION; AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS ASSOCIATION, FKA National Petrochemical &

No. 12-15135

D.C. Nos.
1:09-cv-02234-
LJO-GSA
1:10-cv-00163-
LJO-DLB

ORDER

Refiners Association; AMERICAN TRUCKINGS ASSOCIATIONS; CENTER FOR NORTH AMERICAN ENERGY SECURITY; THE CONSUMER ENERGY ALLIANCE,

*Plaintiffs-Appellees*,

v.

RICHARD W. COREY, in his official capacity as Executive Officer of the California Air Resources Board; MARY D. NICHOLS; DANIEL SPERLING; KEN YEAGER; DORENE D'ADAMO; BARBARA RIORDAN; JOHN R. BALMES; LYDIA H. KENNARD; SANDRA BERG; RON ROBERTS; JOHN G. TELLES, in his official capacity as member of the California Air Resources Board; RONALD O. LOVERIDGE, in his official capacity as member of the California Air Resources Board; EDMUND G. BROWN, JR., in his official capacity as Governor of the State of California; KAMALA D. HARRIS, Attorney General, in her official capacity as Attorney General of the State of California,

*Defendants-Appellants*,

ENVIRONMENTAL DEFENSE FUND; NATURAL RESOURCES DEFENSE

COUNCIL; SIERRA CLUB;
CONSERVATION LAW FOUNDATION,
  *Intervenor-Defendants-Appellants*.

Filed January 22, 2014

Before: Dorothy W. Nelson, Ronald M. Gould,
and Mary H. Murguia, Circuit Judges.

Order;
Concurrence by Judge Gould;
Dissent by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Fuel Standards/Commerce Clause

The panel denied the petitions for rehearing en banc on behalf of the court in a case alleging that California's Low Carbon Fuel Standard, Cal. Code Regs. tit. 17, §§ 95480–90 (2011), violated the dormant Commerce Clause and was preempted by Section 211(o) of the Clean Air Act, 42 U.S.C. § 7545(o).

In the opinion, the panel held that the Fuel Standard's ethanol provisions were not facially discriminatory, and reversed that portion of the district court's decision. The

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel also reversed the district court's decision that the Fuel Standard was an impermissible extraterritorial regulation. The panel affirmed the district court's conclusion that the Fuel Standard's  crude oil provisions were not facially discriminatory, but  reversed the district court's holding that the provisions were discriminatory in purpose and effect.  The panel affirmed the district court's conclusion that Section 211(c)(4)(b) of the Clean Air Act did not insulate California from scrutiny under the dormant Commerce Clause. Judge Murguia concurred in part and dissented from the majority's conclusion that the ethanol regulations did not facially discriminate against interstate commerce.

Concurring in the denial of rehearing en banc, Judge Gould stated that in his view the opinion and partial dissent fairly presented the key issues in this appeal, and the denial order should be read with the majority opinion's reasoning in mind.  He wrote to offer supplemental observations that responded to the views of the judges who dissented from the denial of rehearing en banc.

Dissenting from the denial of rehearing en banc, Judge M. Smith, joined by Judges O'Scannlain, Callahan, Bea, Ikuta and N.R. Smith, and joined by Judge Murguia as to Part III, stated that in upholding California's ethanol regulations, the majority disregarded longstanding dormant Commerce Clause doctrine, and placed the law of this circuit squarely at odds with Supreme Court precedent.

## ORDER

The full court was advised of the petitions for rehearing en banc.  A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration.  Fed. R. App. P. 35.

The petitions for rehearing en banc are **DENIED**.

GOULD, Circuit Judge, concurring in the denial of rehearing en banc:

I respectfully file this separate concurrence in the denial order.  In my view, the opinion and partial dissent fairly present the key issues in this appeal, and the denial order should be read with the majority opinion's reasoning in mind.  But in light of the views of my dissenting colleagues, I offer supplemental observations.

First, the dissent is riddled with overstatements.  For example, it claims that California's Low Carbon Fuel Standard ("LCFS")—and the ethanol provisions contained therein—explicitly discriminates against other states and is a "protectionist regulatory scheme that threatens to Balkanize our national economy."  Dissent at 14.  Not only is this mere alarmist rhetoric, it also does not fit the reality of the California legislation.  Moreover, although the dissent trumpets that nine states seek rehearing, the converse is that 41 do not.  And some states, like Washington and Oregon, have already joined California in its endeavor to combat global warming by reducing greenhouse gas emissions from

fuels. Finally, the dissent characterizes the LCFS as an extraterritorial regulation, and argues that the majority's position to the contrary contravenes Supreme Court precedent. This is an incorrect view of the law: California is free to regulate commerce *within* its borders even if it has an ancillary goal of influencing the choices of actors in other states. *See Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003).

Second, the dissent is written as if the majority opinion conclusively determined that the LCFS was above constitutional reproach. It begins, for example, by accusing the majority of "upholding California's ethanol regulations." Dissent at 14. It later repeats this charge. *See* Dissent at 19. We did no such thing. Believing that findings of fact and more proceedings in the district court were needed to determine the LCFS's constitutionality, we remanded. All we did, in other words, was to reject the argument that the LCFS's ethanol provisions facially discriminate against out-of-state commerce. Our remand advises the district court to determine "whether the Fuel Standard's ethanol provisions discriminate in purpose or in practical effect." *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1078 (9th Cir. 2013). And we instructed the district court to apply strict scrutiny to those provisions if it found that they did discriminate, or to apply the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), if it found that they did not. *Rocky Mtn. Farmers Union*, 730 F.3d at 1078. The dissent acknowledges our remand, but it rhetorically argues that the remand has a "predestined" outcome, Dissent at 17, because of our statement that the LCFS incorporates state boundaries for "good and non-discriminatory" reasons, *Rocky Mtn. Farmers Union*, 730 F.3d at 1107. There is a simple response to this critique, which has no legal merit: We

reviewed this case at the summary judgment stage. As such, we had to take as true all facts presented by California and reasonable inferences therefrom. Our statement, then, about good and non-discriminatory reasons for incorporating state boundaries into the LCFS methodology is based on evidence that had to be credited at the summary judgment stage. It will not control what the district court decides on remand as it considers the LCFS's purpose and effect and makes factual findings on disputed evidence.

Similarly, the dissent asserts that our opinion "nullifies" constitutional limitations on states' ability to legislate in ways that affect other states. Dissent at 15. I disagree. If the LCFS in purpose or practical effect discriminates against interstate commerce, such limitations still exist in the form of strict scrutiny. And even if it does not discriminate, the *Pike* balancing test imposes its own limitations on states' ability to legislate in this arena.[1]

Third, the dissent argues that the LCFS's ethanol provisions facially discriminate against out-of-state commerce by drawing lines based on state borders, and that strict scrutiny therefore applies to invalidate the law. I disagree. For the reasons stated in the majority opinion, I believe that California made its geographic distinctions based on the carbon impact and intensity of various fuels, not on their state-of-origin. True, the LCFS does attribute different

---

[1] The dissent's insistence that strict scrutiny should be applied to the regulatory provisions here, absent a finding of discriminatory purpose or effect, is a type of "archaic formalism" that should not be encouraged by the Supreme Court. *Rocky Mtn. Farmers Union*, 730 F.3d at 1107. In my view, the Supreme Court has not applied strict scrutiny to provisions like those in the LCFS based on a theory of facial discrimination.

carbon intensity values to fuels from different geographic areas. CAL. CODE REGS. tit. 17, § 95486(b). But the dissent's argument that it is "clear that the challenged regulations discriminate against interstate commerce" is wide of the mark. Dissent at 21. A legislative geographic distinction is not facially discriminatory merely because it affects in-state and out-of-state interests unequally. Rather, as long as there is "some reason, apart from their origin, to treat them differently," California may distinguish between Midwestern, Brazilian, and California ethanols. *Philadelphia v. New Jersey*, 437 U.S. 617, 627 (1978). The dissent disregards this principle. To the extent that California treats fuels based on their location, it does so for non-discriminatory reasons; if Midwestern ethanol is more carbon-intensive than its California counterpart, that is so not because of its origin but rather because of its method of production and other objective factors, including transportation-related emissions.

Further, the pathways set forth in the LCFS—and reproduced at the end of the majority opinion in Appendix One—are not immutable legislative classifications. They are default pathways, and while they may be relied upon by producers, they may also be supplanted if a producer creates an individualized pathway by supplying its own data about the carbon emission impact of its product. This allows ethanol producers in California and elsewhere some control over the carbon intensity value assigned to their fuels. And it shows that the dissent's position that the LCFS facially discriminates is incorrect. The LCFS's ethanol provisions are based on an objective fact, carbon emissions, not on the constitutionally impermissible goal of benefitting local companies at the expense of foreign ones. Such a system does not warrant strict scrutiny.

The dissent notes that "the Fuel Standard expressly assigns a higher carbon intensity to Midwestern ethanol." Dissent at 21.  In fact, however, the lowest carbon intensity values yet—supplied by producers who went outside the default pathways to provide their own data—are from Midwestern and Brazilian ethanol producers. *See* CAL. CODE REGS. tit. 17, § 95486(b)(1); *Rocky Mtn. Farmers Union*, 730 F.3d at 1084.  This is so largely because the LCFS takes into account carbon emissions from transportation, and most California ethanol producers import corn from the Midwest to make their product, whereas Midwestern ethanol producers, who have corn close by, avoid those transportation emissions.  The geographic distinctions made by California, then, are not classifications based on state boundaries *per se*; rather, they are classifications based on the carbon impact of fuels as calculated under a rubric that considers transportation-related emissions.  That does not warrant strict scrutiny unless the district court concludes that the LCFS discriminates against out-of-state commerce in purpose or practical effect.  That is why we remanded with instructions to consider such purpose and effect.

Fourth, the tone and substance of the dissent is perhaps aimed at encouraging Supreme Court review.  A petition for writ of certiorari from the parties who sought rehearing is likely forthcoming, but our court properly declines to give its judicial imprimatur to the dissent's position.  Because Supreme Court review is possible, however, I set forth my own views on that prospect.  On the one hand, the Supreme Court's considered judgment could be helpful to clarify as soon as practical what states may do of their own accord to deter or slow global warming.  The Supreme Court, if it wants to do so at this time, can set constitutional limits, binding in all circuits, as to what the individual states in our

Union may do to combat global warming.  The Supreme Court also can give meaning to, or limit, the general principle that state experimentation is often a desirable predicate to actions by other states or the federal government.  On the other hand, the record in this case is incomplete and thus unsuitable for understanding the full scope of the issues presented.    The  panel  remanded  for  findings  on discriminatory purpose or effect which, if it exists, would invoke strict scrutiny.  And, if not, the majority required on remand that the district court engage in *Pike* balancing, weighing the LCFS's benefits against its impact on interstate competition.  The issues raised by the dissent, then, may be rendered moot by the district court's decision, and in any event there will be a more complete record, including findings on purpose and effect, on which to make a ruling about the controlling legal principles.

Fifth, the dissent contends that California admits its scheme will, by itself, have little effect in averting environmental catastrophe.  Dissent at 22.  This argument ignores not only the principle that incremental change, when aggregated, can be significant, but also the possibility that successful experimentation by California could lead to broader action by other states and/or the federal government. The Supreme Court has reminded us that it is "erroneous" to assume that "a small, incremental step, because it is incremental"  is  legally—or  truly—insignificant. *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007).  Just as a journey of 1,000 miles begins with a single step, so too must legislative action to fight global warming start somewhere. Further, once other states appreciate the benefits of the LCFS, there may be a cascade of similar laws throughout the country—and perhaps federal action—aimed at stemming the tide of global warming.  Indeed, proposed legislation in

Oregon and Washington is an example of this.  *See Rocky Mtn. Farmers Union*, 730 F.3d at 1104 n.14; Michael Wines, *Climate Pact Is Signed by 3 States and Partner*, N.Y. TIMES, Oct. 30, 2013, at A18 (noting an agreement between California, Oregon, and Washington, as well as British Columbia, to "raise the cost of greenhouse gas pollution, promote zero-emission vehicles and push for the use of cleaner-burning fuels in transportation" as part of a "broad alliance to combat climate change").

Meanwhile, global temperatures are increasing, storms are intensifying, polar ice caps are melting, and seas are rising. If California's experiment with the LCFS is to succeed in inducing increased production of alternative fuels and/or decreased carbon impact of existing fuels, the sooner it can proceed, the better; it could take years, or decades, for other states to recognize the benefits of the LCFS, to react to it, and to engage in similar experiments themselves.  Justice Brandeis recognized the importance of this sort of state experimentation in his now-famous dissent in *New State Ice Co. v. Liebmann*, when he wrote: "It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."  285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).  This is what California has done with the LCFS. The benefits that may flow from such cooperative state action do not, as the dissent urges, threaten to "Balkanize our national economy."  Dissent at 14.  Rather, the development of alternative fuels and a market system regulating carbon emissions would likely benefit the national economy.

Sixth, the dissent's argument that California's "economic clout" means that the "practical effect" of the LCFS is to

regulate commerce beyond California's borders misstates the law. Dissent at 24. In fact, Supreme Court precedent points in a contrary direction. *See, e.g.*, *Walsh*, 538 U.S. at 669 (refusing to apply the extraterritoriality doctrine to a law that "does not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect" (internal quotation marks omitted)). While a state may not mandate compliance with its preferred policies in wholly out-of-state transactions, it may regulate commerce within its boundaries even if one of its goals is to influence the out-of-state choices of market participants. *See id.* This is what California permissibly has done with the LCFS.[2]

A majority of active judges on our court wisely refused to grant en banc consideration in this case. I concur in the order denying rehearing en banc.

---

[2] If the dissent's position were adopted, it would spell the end of much beneficent state legislation. Let us assume, for example, that a safety-conscious state regulates automobiles, preventing them from being sold in that state absent certain safety protections like airbags or a performance standard requiring a minimum survival rate from a crash at 40 miles per hour. The dissent apparently would say that the safety-conscious state is regulating extraterritorially because its restrictions provide incentives to automakers in other states to make their cars safer if they wish to sell them in the safety-conscious state. I respectfully disagree. The Supreme Court has not said anything to that effect, and, as explained above, its precedent points in the opposite direction.

M. SMITH, Circuit Judge, with whom O'SCANNLAIN, CALLAHAN, BEA, IKUTA, and N.R. SMITH, Circuit Judges, join, and with whom MURGUIA, Circuit Judge, joins as to Part III, dissenting from the denial of rehearing en banc:

In upholding California's ethanol regulations, the 2-1 majority in this case finds at least facially constitutional a protectionist regulatory scheme that threatens to Balkanize our national economy. In so doing, the majority disregards longstanding dormant Commerce Clause doctrine, and places the law of this circuit squarely at odds with Supreme Court precedent.

The deleterious effects of California's scheme on our national economic union are not speculative. The states of Nebraska, Illinois, Iowa, Kansas, Michigan, Missouri, North Dakota, Ohio, and South Dakota (which are major producers of corn and ethanol) filed an amicus brief in support of en banc rehearing.[1] They argue that California's ethanol regulations "impinge[] on the sovereign interests of the Amici States to regulate farming, ethanol production, and other activities within their own borders as they see fit." These states further observe that California's regulations "close[] the California border to ethanol produced in Amici States in favor of chemically-identical ethanol produced within California . . . ." These are the very types of concerns that generated the Supreme Court's dormant Commerce Clause case law, and the panel majority ignores them.

---

[1] In his concurrence in the denial of rehearing en banc, Judge Gould notes that 41 states did not join in the amicus brief seeking en banc rehearing. This should be no surprise since one of those states is California, which promulgated the offending regulations, and most of the other states are not major corn or ethanol producers.

Our federal system grants states substantial discretion to remedy perceived local problems.  But the Constitution sharply constrains their power to do so at the expense of other states.  Because the majority opinion nullifies any such limitations, I respectfully dissent from our failure to rehear this case en banc.

## I.

In the Global Warming Solutions Act of 2006, California pledged to reduce its greenhouse gas emissions to 1990 levels by the year 2020.  To implement this goal, the California Air Resources Board (CARB) promulgated the Low Carbon Fuel Standard (Fuel Standard).   The Fuel Standard requires businesses that sell transportation fuels in California to reduce the "carbon intensity" of their fuels by ten percent before 2020.  As CARB describes it, "[c]arbon intensity is not an inherent chemical property of a fuel, but rather it is reflective of the process in making, distributing, and using that fuel."

The Fuel Standard explicitly treats in-state and out-of-state ethanol differently in calculating carbon intensity.[2]  Indeed, a fuel's carbon intensity depends in part on the location where it is produced.  All else equal, the regulations always assign a higher carbon intensity to Midwestern ethanol than ethanol from California.  As such, CARB predicts that the Fuel Standard will soon eliminate Midwestern ethanol from the California market.  Further, the regulations sweep beyond the borders of California.  Because

---

[2] For the sake of brevity, I focus on the majority's endorsement of California's ethanol regulations.  But the panel's approval of California's sweeping crude oil regulations also merited en banc review.

a fuel's carbon intensity depends largely on out-of-state production and land use decisions, California's scheme necessarily affects those processes.

On December 23, 2009, and February 2, 2010, Plaintiffs-Appellees filed suit in the United States District Court for the Eastern District of California, contending that California's regulations violate the dormant Commerce Clause. Specifically, two groups of Plaintiffs led by the Rocky Mountain Farmers Union (Rocky Mountain) and the American Fuels & Petrochemical Manufacturers Association challenged the Fuel Standard's ethanol regulations. On December 29, 2011, the district court agreed that the ethanol regulations violate the dormant Commerce Clause, awarded summary judgment on that basis, and granted Rocky Mountain's motion for a preliminary injunction.

On September 18, 2013, a divided panel of our court reversed and remanded in principal part. According to the majority, the Fuel Standard's ethanol regulations do not facially discriminate against interstate commerce because California has "good and non-discriminatory reason[s]" for treating out-of-state ethanol differently. *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1107 (9th Cir. 2013). The majority further concluded that the regulations do not have extraterritorial reach because they merely provide incentives to out-of-state firms. The majority therefore reversed the judgment of the district court in relevant part, vacated the preliminary injunction, and remanded to the district court for consideration of whether the ethanol regulations "discriminate in purpose or in practical effect." *Id.* at 1078. The panel instructed the district court to apply strict scrutiny if it finds that they do, and to apply the balancing test established in *Pike v. Bruce Church, Inc.*,

397 U.S. 137 (1970), if it determines that they do not.  *Rocky Mountain Farmers Union*, 730 F.3d at 1078.  However, the majority made clear that the outcome of this analysis is predestined, instructing the district court that the regulations "incorporate state boundaries for good and non-discriminatory reason[s]."  *Id.* at 1107.

Judge Murguia concurred in part and dissented in part.  While she agreed with the majority in some respects, she disagreed regarding the ethanol regulations.  Judge Murguia determined that the ethanol regulations were facially discriminatory, and she concluded that they failed to withstand strict scrutiny because California could attempt to mitigate climate change through non-discriminatory means.

II.

In the name of combating "a new type of harm," the majority rejects longstanding dormant Commerce Clause precedent as mere "archaic formalism."  *Rocky Mountain Farmers Union*, 730 F.3d at 1107.  I therefore begin with a brief survey of the doctrine, and its critical place in our constitutional order.

"During the first years of our history as an independent confederation, the National Government lacked the power to regulate commerce among the States," and "each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents . . . ."  *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 571 (1997).  This "conflict of commercial regulations, destructive to the harmony of the States . . . . was the immediate cause that led to the forming of a [constitutional] convention."  *Id.* (quoting *Gibbons v. Ogden*,

22 U.S. (9 Wheat.) 1, 224 (1824) (Johnson, J., concurring in the judgment)).  Thus, as Justice Cardozo observed long ago, the Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935).

To implement the Constitution's objective of national economic unity, the Supreme Court "has consistently held that the Constitution's express grant to Congress of the power to 'regulate Commerce . . . among the several States,' Art. I, § 8, cl. 3, contains 'a further, negative command, known as the dormant Commerce Clause . . . .'" *Am. Trucking Ass'ns v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)).[3]  The dormant Commerce Clause promotes economic integration by "significantly limit[ing] the ability of States and localities to regulate or otherwise burden the flow of interstate commerce." *McBurney v. Young*, 133 S. Ct. 1709, 1719 (2013) (quoting *Maine v. Taylor*, 477 U.S. 131, 151 (1986)).  "It is driven by a concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state

---

[3] "The 'negative' aspect of the Commerce Clause was considered the more important by the 'father of the Constitution,' James Madison.  In one of his letters, Madison wrote that the Commerce Clause 'grew out of the abuse of the power by the importing States in taxing the non-importing, and was intended as a negative and preventive provision against injustice among the States themselves, rather than as a power to be used for the positive purposes of the General Government.'" *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 n.9 (1994) (quoting 3 M. Farrand, Records of the Federal Convention of 1787, at 478 (1911)).

competitors.'" *McBurney*, 133 S. Ct. at 1719  (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1988)).

In upholding California's sweeping and discriminatory ethanol regulations, the majority brushes aside two foundational tenets of dormant Commerce Clause jurisprudence.  First, the majority gives short shrift to the principle that "[s]tate laws that discriminate against interstate commerce face 'a virtually *per se* rule of invalidity.'" *Granholm v. Heald*, 544 U.S. 460, 476 (2005) (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)). Second, the majority abjures the rule that "a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid . . . ." *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989).

Until recently, our circuit faithfully applied these doctrines, striking down parochial state laws that burdened interstate commerce. *See, e.g.*, *Birth Hope Adoption Agency, Inc. v. Ariz. Health Care Cost Containment Sys.*, 218 F.3d 1040, 1044–45 (9th Cir. 2000); *NCAA v. Miller*, 10 F.3d 633, 640 (9th Cir. 1993); *BFI Med. Waste Sys. v. Whatcom Cnty.*, 983 F.2d 911, 913 (9th Cir. 1993).  The majority opinion represents a dramatic and unwarranted change of course.

III.

The majority's most basic, and perhaps most consequential, error is its contention that California's regulatory scheme does not facially discriminate against out-of-state commerce.  The majority concludes, in essence, that the regulations are not discriminatory on their face because California has "some reason, apart from [its] origin, to treat [out-of-state ethanol] differently." *Rocky Mountain Farmers*

*Union*, 730 F.3d at 1089 (quoting *Philadelphia*, 437 U.S. at 627). As Judge Murguia observes in dissent, however, this reasoning "puts the cart before the horse," and is therefore "inconsistent with Supreme Court precedent." *Rocky Mountain Farmers Union*, 730 F.3d at 1108 (Murguia, J., concurring in part and dissenting in part).

Contrary to the majority's analytical framework, "[d]etermining whether a regulation facially discriminates against interstate commerce begins and ends with the regulation's plain language." *Id.* Under the dormant Commerce Clause, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994). "[T]he purpose of, or justification for, a law has no bearing on whether it is facially discriminatory." *Id.* at 100 (citing *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 340–41 (1992)).

Further, the language from *Philadelphia*, 437 U.S. at 627, on which the majority relies has nothing to do with determining whether a regulation facially discriminates against interstate commerce. Rather, it merely shows that some discriminatory regulations may ultimately survive strict scrutiny. *See United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 366 (2007) (Alito, J., dissenting) (citing quoted passage from *Philadelphia* as example of applying strict scrutiny). Thus, whether California has good reasons for penalizing Midwestern ethanol simply has nothing to do with whether the state's regulations are facially discriminatory.

It is clear that the challenged regulations discriminate against interstate commerce. Most blatantly, the Fuel Standard expressly assigns a higher carbon intensity to Midwestern ethanol, based in part on the greenhouse gas emissions arising from its transportation to California. Ethanol produced in-state faces no such penalty. As Judge Murguia notes, the regulatory scheme therefore "differentiates between in-state and out-of-state ethanol, according more preferential treatment to the former at the expense of the latter." *Rocky Mountain Farmers Union*, 730 F.3d at 1108 (Murguia, J., concurring in part and dissenting in part). Because ethanol from Midwestern states faces a regulatory burden that chemically identical in-state ethanol does not, California's regime is facially discriminatory. *See Or. Waste*, 511 U.S. at 99–100. In concluding otherwise, the majority contravenes black letter law and renders our dormant Commerce Clause jurisprudence incoherent.

IV.

The majority compounds its error by concluding that legitimate local concerns support California's regulation of the interstate ethanol market. Because the regulations are facially discriminatory, any justifications for them must "pass the 'strictest scrutiny.'" *Id.* at 101 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979)). To withstand this searching review, "the statute must serve a legitimate local purpose, and the purpose must be one that cannot be served as well by available nondiscriminatory means." *Maine*, 477 U.S. at 140. "This is an extremely difficult burden, 'so heavy that facial discrimination by itself may be a fatal defect.'" *Camps Newfound*, 520 U.S. at 582 (quoting *Or. Waste*, 511 U.S. at 101)).

California fails to carry its heavy burden. According to the majority, "[i]f [greenhouse gas] emissions continue to increase, California may see its coastline crumble under rising seas, its labor force imperiled by rising temperatures, and its farms devastated by severe droughts." *Rocky Mountain Farmers Union*, 730 F.3d at 1097. When viewed against this backdrop, California's regulatory justifications appear weighty indeed. But the majority overlooks a critical fact—the Fuel Standard will not remedy the problem. To the contrary, CARB acknowledges that "[greenhouse gas] emission reductions by the [Fuel Standard] alone will not result in significant climate change." In other words, California admits that its scheme will have little to no effect in averting the environmental catastrophe envisioned by the majority. This concession alone shows that the regulations fail strict scrutiny.[4]

And the defects in California's ethanol regime go well beyond its ineffectiveness. While the regulations may not slow climate change, they will assuredly promote California's energy industry at the expense of out-of-state competitors. CARB acknowledges that the Fuel Standard will "reduc[e] the volume of transportation fuels that are imported from other states . . . ." As such, CARB expects that the regulations will "keep[] more money in the State," and that they "will provide needed employment, [and] an increased tax base for the State . . . ." In short, CARB admits that it

---

[4] As Judge Murguia observes in dissent, the ethanol regulations also fail strict scrutiny because California could endeavor to reduce greenhouse gas emissions through non-discriminatory means. California could, for instance, "treat[] ethanol produced in efficient plants more favorably than ethanol from inefficient plants . . . ." *Rocky Mountain Farmers Union*, 730 F.3d at 1109 (Murguia, J., concurring in part and dissenting in part).

purposefully "developed the [Fuel Standard] in a manner that minimizes costs and maximizes the total benefits to California."

Of course, states may pass legislation that benefits local industry.  But, "in all but the narrowest circumstances," they may not do so at the expense of other states.  *Granholm*, 544 U.S. at 472.  In concluding that California's ethanol regulations are facially neutral in spite of their overt and unjustified discrimination against interstate commerce, the majority departs from settled law and cuts this circuit's dormant Commerce Clause jurisprudence loose from its moorings.

V.

California's ethanol regulations suffer from another constitutional defect: they seek to control conduct in other states.  The Supreme Court has clearly and consistently instructed that "a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid . . . ."  *Healy*, 491 U.S. at 332; *see also Baldwin*, 294 U.S. at 521–22.  And the ethanol regulations plainly have extraterritorial reach, as they seek to influence out-of-state land use decisions and production methods.  In concluding otherwise, the majority disregards controlling precedent and departs from the holdings of the Supreme Court and our sister circuits.  More fundamentally, the majority approves a regime that threatens the very sort of "economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation."  *Granholm*, 544 U.S. at 472 (quoting *Hughes*, 441 U.S. at 325–26)).

The rule that one state "has no power to project its legislation into" another state, *Baldwin*, 294 U.S. at 521, is fundamental to our federal system.    It embodies "the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy*, 491 U.S. at 335–36 (footnotes omitted).    Thus, "the 'Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State . . . .'" *Id.* at 336 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982) (plurality opinion)). California's ethanol regulations fail this test.

It is no answer to assert, as the majority does, that the Fuel Standard merely provides "incentives" that might influence out-of-state conduct. *See Rocky Mountain Farmers Union*, 730 F.3d at 1103–04.    By penalizing certain out-of-state practices, California's regulations control out-of-state conduct just as surely as a mandate would, particularly in view of California's economic clout.    Thus, whether California's scheme is characterized as providing "incentives" or establishing "mandates," it has the practical effect of regulating interstate commerce.    And, under the dormant Commerce Clause, "[t]he critical inquiry is whether the *practical effect* of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336 (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)) (emphasis added).[5]

---

[5] Other courts of appeals have correctly held that Commerce Clause analysis turns on a law's practical consequences, not on semantics. *See, e.g.*, *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 69 (1st Cir.

Finally, the majority significantly underestimates the risk that California's ethanol scheme will spur other states to enact "the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude." *Healy*, 491 U.S. at 337. For example, now that the panel majority has blessed California's experiment in extraterritorial regulation, Oregon may move forward with its own Clean Fuels Program. The majority assures us that the Oregon program and those of other states will merely "complement[]" California's, *Rocky Mountain Farmers Union*, 730 F.3d at 1104, but there is no guarantee that this is so.[6] In any event, ethanol producers will soon face the daunting prospect of navigating several interlocking, if not entirely contradictory, regulatory regimes. Fragmentation of the national economy may ensue.

Two brief examples illustrate the point. If California may, consistent with the dormant Commerce Clause, seek to influence out-of-state ethanol production, it may just as legitimately seek to influence any out-of-state conduct with perceived local effects. Under the majority's reasoning,

---

1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000); *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 661–62 (7th Cir. 1995).

[6] California recently pledged to align its energy policies with Oregon, Washington, and British Columbia. Michael Wines, *Climate Pact Is Signed by 3 States and Partner*, N.Y. Times, Oct. 30, 2013, at A18. If, as the majority holds, the Constitution poses no obstacle to California's regulation of interstate commerce, there is little reason to doubt that California may regulate foreign commerce as well. Unsurprisingly, this conclusion puts us squarely at odds with our sister circuits. *See Natsios*, 181 F.3d at 69. Further, the grouping of states in this fashion represents the type of "economic Balkanization" that the Commerce Clause was intended to prevent. *Hughes*, 441 U.S. at 325.

California could impose regulatory penalties (or grant "incentives") to require manufacturers in Texas to pay higher wages to their employees if they intend to sell their products in California.  Such a measure would, of course, benefit California to the extent that it would minimize the risk of competition from Texas businesses, with their lower labor costs.  But under the same logic, Texas could—and assuredly would—respond in kind, perhaps by penalizing California agriculture on account of its reliance on costly irrigation methods.

Similarly, California could—under the majority's reasoning—penalize out-of-state wineries to account for the environmental effects of transporting their wines to California.  Like the Fuel Standard, such a regulation would promote California businesses at the expense of out-of-state interests.  And, also like the Fuel Standard, such a regulation could lead to destructive interstate retaliation.[7]

The very purpose of the dormant Commerce Clause is to ensure that "[r]ivalries among the States are . . . kept to a minimum, and a proliferation of trade zones is prevented." *Granholm*, 544 U.S. at 472 (citing *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994)).  Until the majority's ruling, the dormant Commerce Clause guarded against such economic fragmentation. *See Baldwin*, 294 U.S. at 524 (explaining that a state may not "condition importation

---

[7] In his concurrence in the denial of rehearing en banc, Judge Gould relies on *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644, 669 (2003), for the proposition that California may legitimately regulate in-state commerce with the goal of influencing out-of-state conduct.  But nothing in *Walsh* repudiates the principle that a state may not close its borders to out-of-state goods unless exporters alter their out-of-state conduct. *See Baldwin*, 294 U.S. at 524.

upon proof of a satisfactory wage scale in factory or shop"). Now, the dormant Commerce Clause has been rendered toothless in our circuit, and we stand in open defiance of controlling Supreme Court precedent.

## VI.

The majority opinion in this case upholds a regulatory scheme that, on its face, promotes California industry at the expense of out-of-state interests. The majority opinion also sanctions California's clear attempt to project its authority into other states. Because the Constitution forbids such an expansive and discriminatory exercise of state power over interstate commerce, I respectfully dissent from our failure to rehear this case en banc.