**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS; AMERICAN
TRUCKING ASSOCIATIONS, INC., a
trade association; CONSUMER
ENERGY ALLIANCE, a trade
association,

*Plaintiffs-Appellants*,

v.

JANE O'KEEFFE; ED ARMSTRONG;
MORGAN RIDER; COLLEEN JOHNSON;
MELINDA EDEN; DICK PEDERSEN;
JONI HAMMOND; WENDY WILES;
DAVID COLLIER; JEFFREY STOCUM;
CORY-ANN WIND; LYDIA EMER;
LEAH FELDON; GREG ALDRICH; and
SUE LANGSTON, in their official
capacities as officers and employees
of the Oregon Department of
Environmental Quality; ELLEN F.
ROSENBLUM, in her official capacity
as Attorney General of the State of
Oregon; KATE BROWN, in her
official capacity as Governor of the
State of Oregon,

*Defendants-Appellees*,

No. 15-35834

D.C. No.
3:15-cv-00467-
AA

OPINION

CALIFORNIA AIR RESOURCES BOARD;
STATE OF WASHINGTON; OREGON
ENVIRONMENTAL COUNCIL; SIERRA
CLUB; NATURAL RESOURCES
DEFENSE COUNCIL; ENVIRONMENTAL
DEFENSE FUND; CLIMATE
SOLUTIONS,
    *Intervenor-Defendants-Appellees.*

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted March 6, 2018
Portland, Oregon

Filed September 7, 2018

Before:  Raymond C. Fisher, N. Randy Smith,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz;
Dissent by Judge N.R. Smith

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's dismissal of a complaint challenging Oregon's Clean Fuels Program, which regulates the production and sale of transportation fuels based on greenhouse gas emissions.

Plaintiffs, the American Fuel and Petrochemical Manufacturers, American Trucking Associations, and Consumer Energy Alliance, alleged that the Oregon Program violated the Commerce Clause and was preempted by § 211(c) of the Clean Air Act.

Addressing the Commerce Clause claim, the panel held that plaintiffs' assertion that the Oregon Program facially discriminates against out-of-state fuels by assigning petroleum and Midwest ethanol higher carbon intensities than Oregon biofuels was squarely controlled by *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1081 (9th Cir. 2013). The panel held that like the California Low Carbon Fuel Standard at issue in *Rocky Mountain*, the Oregon Program discriminated against fuels based on lifecycle greenhouse gas emissions, not state of origin.

The panel held that the complaint failed to plausibly allege that the Oregon Program was discriminatory in purpose. The panel held that none of the alleged discriminatory statements cited by plaintiffs undermined the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Oregon Program's stated purpose of reducing greenhouse gas emissions. The panel rejected plaintiff's claim that that the Oregon Program's assignment of carbon intensity credits and deficits effectuated a discriminatory effect. The panel also rejected the claim that the Oregon Program violates the Commerce Clause and principles of interstate federalism by attempting to control commerce occurring outside the boundaries of the state.

Addressing the preemption claim, the panel held that the Environmental Protection Agency's decision not to regulate methane under § 211(k) of the Clean Air Act was not a finding that regulating methane's contributions to greenhouse gas emissions was unnecessary, and thus the decision not to regulate was not preemptive under § 211(c)(4)(A)(i).

Dissenting, Judge N.R. Smith stated that he could not dismiss plaintiffs' claim alleging that the practical effect of the Oregon Program impermissibly favored in-state interests at the expense of out-of-state interests.

## COUNSEL

Paul J. Zidlicky (argued), Paul J. Ray, and Roger R. Martella Jr., Sidley Austin LLP, Washington, D.C., for Plaintiffs-Appellants.

Denise Gale Fjordbeck (argued), Attorney-in-Charge; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Civil/Administrative Appeals, Office of the Attorney General, Salem, Oregon; for Defendants-Appellees.

Amanda W. Goodin and Patti A. Goldman, Earthjustice, Seattle, Washington; David Pettit, Natural Resources Defense Council, Santa Monica, California; Joanne Spalding, Sierra Club, Oakland, California; Sean H. Donahue, Donahue & Goldberg LLP, Washington, D.C.; for Intervenor-Defendants-Appellees Oregon Environmental Council, Sierra Club, Natural Resources Defense Council, Environmental Defense Fund, and Climate Solutions.

Margaret Elaine Meckenstock (argued), Deputy Attorney General; Gavin G. McCabe, Supervising Deputy Attorney General; Robert W. Byrne, Senior Assistant Attorney General; Office of the Attorney General, Oakland, California; Thomas J. Young, Senior Counsel; Robert W. Ferguson, Attorney General; Office of the Attorney General, Olympia, Washington; for Intervenor-Defendants-Appellees California Air Resources Board and State of Washington.

**OPINION**

HURWITZ, Circuit Judge:

This case requires us to decide whether an Oregon program regulating the production and sale of transportation fuels based on greenhouse gas emissions violates the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, or is preempted by § 211(c) of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401, 7545.  The district court dismissed a complaint challenging the Oregon program.  We affirm.

## I.  Background

### A.  The Oregon Program

In 2007, the Oregon legislature found that "[g]lobal warming poses a serious threat to the economic well-being, public health, natural resources and environment of Oregon," and identified "a need to . . . take necessary action to begin reducing greenhouse gas emissions."  Or. Rev. Stat. § 468A.200(3), (7).  The legislature accordingly created the Oregon Clean Fuels Program (the "Oregon program") and instructed the Oregon Environmental Quality Commission ("OEQC") to adopt rules to decrease lifecycle greenhouse gas emissions from transportation fuels produced in or imported into Oregon.  Or. Rev. Stat. §§ 468A.266–268. Between 2010 and 2015, the OEQC promulgated rules designed to reduce greenhouse gas emissions from use and production of transportation fuels in Oregon to at least 10%

lower than 2010 levels by 2025. *See* Or. Admin. R. 340-253-0000-8100.[1]

Under these rules, a regulated party must keep the average carbon intensity[2] of all transportation fuels used in Oregon below an annual limit. *See id.* 340-253-0100(6), -8010, -8020. The annual carbon intensity limits become more stringent annually through 2025. *See id.*[3]

A fuel with a carbon intensity below the limit generates a credit, and one with a carbon intensity above the limit generates a deficit. *See id.* 340-253-0040(30), (35), -1000(5). Regulated parties must generate carbon intensity "credits" greater than or equal to their "deficits" on an annual basis. Regulated parties can buy or sell credits, store them for future use, or use them to offset immediate deficits. Thus, a "regulated party may demonstrate compliance in each compliance period either by producing or importing fuel that in the aggregate meets the standard or by obtaining sufficient credits to offset the deficits it has incurred for such fuel produced or imported into Oregon." *Id.* 340-253-0100(6).

---

[1] The regulations were incorporated by reference into American Fuel's complaint. The parties have also included the regulations in motions for judicial notice, Dkt. 13, 37, 52, which we **GRANT.**

[2] "'Carbon intensity' or 'CI' means the amount of lifecycle greenhouse gas emissions per unit of energy of fuel expressed in grams of carbon dioxide equivalent per megajoule (gCO2e/MJ)." Or. Admin. R. 340-253-0040(20).

[3] Regulated fuel importers or producers must (1) register with the Oregon Department of Environmental Quality ("ODEQ") and (2) report the volumes and carbon intensities of their transportation fuels. Or. Admin. R. 340-253-0100.

The cumulative carbon intensity value attributed to the lifecycle of a particular type of fuel is called a "pathway." *Id.* 340-253-0040(46) ("'Fuel pathway' means a detailed description of all stages of fuel production and use for any particular transportation fuel, including feedstock generation or extraction, production, distribution, and combustion of the fuel by the consumer. The fuel pathway is used to calculate the carbon intensity of each transportation fuel."); *see also Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1081 (9th Cir. 2013) (noting a similar definition in California's Low Carbon Fuel Standard ("LCFS")). The first phase of Oregon rules provided tables with default pathways for various fuels, "including feedstock generation or extraction, production, distribution, and combustion of the fuel by the consumer." Or. Admin. R. 340-253-0040(46), -0400(1). During this phase, regulated parties could either use the default pathways, or seek approval for individualized pathways. *Id.* 340-253-0400(3), -0450.

The second phase of the Oregon rules introduced a scientific modeling tool called OR-GREET, based on "the Greenhouse gases, Regulated Emissions, and Energy in Transportation (GREET) model developed by Argonne National Laboratory" to calculate individualized pathways for non-petroleum fuels. *Id.* 340-253-0040(67), -0400(1); *see also Rocky Mountain*, 730 F.3d at 1080–84 (describing California LCFS, which also uses GREET modeling tools). The OR-GREET employs a "lifecycle analysis" to determine total carbon intensity, which includes emissions from the production, storage, transportation, and use of the fuels, thus accounting for "all stages of fuel production." Or. Admin. R. 340-253-0040(46). The lifecycle analysis allows a state to account for "the climate-change benefits of biofuels such as ethanol, which mostly come before combustion." *Rocky Mountain*, 730 F.3d at 1081. Lifecycle analysis also allows

for an accurate comparison of the carbon effects of fuels produced using different production methods and source materials. *See id.* ("An accurate comparison is possible only when it is based on the entire lifecycle emissions of each fuel pathway.").

Producers and importers of ethanols and biodiesels can obtain carbon intensity scores in one of three ways. If a fuel has been assigned a carbon intensity score under the California LCFS, a regulated party can have that value adjusted for use in Oregon. Or. Admin. R. 340-253-0400(4)(a). Regulated parties can also use individualized carbon intensity scores calculated using the OR-GREET modeling tool. *Id.* 340-253-0500. If it is not possible to obtain an individualized value, a regulated party may also use a default pathway to report carbon intensity. *See id.* 340-253-0450.[4] "Thus fuel producers can take advantage of default and individualized carbon intensity values, and choose what is most advantageous." *Rocky Mountain*, 730 F.3d at 1082.

Because of the uniquely harmful environmental effects of petroleum-based fuels, importers of petroleum-based gasoline and diesel—unlike producers and importers of other fuels—are required to use average carbon intensity pathways, based on the average carbon-intensity values of such fuels in Oregon.[5] Or. Admin R. 340-253-0400(3)(a).

---

[4] The second phase of rules provides two default ethanol pathways—Midwest and Oregon averages—which assume production using the same inputs but different energy sources. Or. Admin. R. 340-253-8030, tbl. 3. These pathways are used only until an individual pathway is approved. *Id.* 340-253-0400(4)(b), -0450(3).

[5] *See Rocky Mountain*, 730 F.3d at 1084 ("Crude oil presents different climate challenges from ethanol and other biofuels. Corn and

This requirement was designed to promote the use and development of alternative fuels, because reliance solely on petroleum-based fuels would make targeted emissions reductions unattainable. *See Rocky Mountain*, 730 F.3d at 1085 ("No matter how efficiently crude oil is extracted and refined, it cannot supply [the targeted] level of reduction. To meet California's ambitious goals, the development and use of alternative fuels must be encouraged.").

## B. Procedural Background

In March 2015, the American Fuel and Petrochemical Manufacturers, American Trucking Associations, and Consumer Energy Alliance (collectively, "American Fuel") filed this action against officials of the ODEQ and OEQC (the "Oregon defendants"), alleging that the Program violated the Commerce Clause and was preempted by § 211(c) of the CAA.[6] The district court granted motions to

---

sugarcane absorb carbon dioxide as they grow, offsetting emissions released when ethanol is burned. By contrast, the carbon in crude oil makes a one-way trip from the Earth's crust to the atmosphere. For crude oil and its derivatives, emissions from combustion are largely fixed, but emissions from production vary significantly. As older, easily accessible sources of crude are exhausted, they are replaced by newer sources that require more energy to extract and refine, yielding a higher carbon intensity than conventional crude oil.").

[6] The plaintiffs are national trade associations. American Fuel's members include nearly all United States refiners and petrochemical manufacturers, and sell transportation fuels throughout Oregon. A number of American Fuel's members produce and sell gasoline, diesel, and ethanol used as transportation fuels in Oregon, and several import such gasoline, diesel, and ethanol into Oregon. Members of the American Trucking Association purchase transportation fuels in Oregon for use in Oregon. The Consumer Energy Alliance's members include industrial consumers and producers of gasoline, diesel, and ethanol.

intervene by several conservation organizations (the "Conservation Intervenors"),[7] the California Air Resource Board, and the State of Washington (the "State Intervenors"). The Oregon defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), and the State Intervenors moved for judgment on the pleadings under Rule 12(c). The district court granted both motions, finding American Fuel's claims "largely barred" by this court's decision in *Rocky Mountain* about a virtually identical California program. The district court also concluded that the Oregon program did not discriminate in purpose or effect against out-of-state ethanol and was not preempted by the CAA.

We review the district court's judgment de novo, taking well-pleaded allegations of material fact as true and construing the complaint in the light most favorable to American Fuel. *AlliedSignal, Inc. v. City of Phoenix*, 182 F.3d 692, 695 (9th Cir. 1999).

## II.  The Commerce Clause

The Commerce Clause grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. Despite its textual focus solely on congressional power, the Clause also "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't*

---

[7] The Conservation Intervenors are the Oregon Environmental Council, the Sierra Club, the Environmental Defense Fund, Climate Solutions, and the Natural Resources Defense Council.

*of Envtl. Quality of State of Or.*, 511 U.S. 93, 98 (1994). This so-called "dormant" Commerce Clause is "driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't. of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1988)); *see also South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2089 (2018) (noting that the Commerce Clause was enacted to combat "the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States" (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–26 (1979)).

But, courts considering dormant Commerce Clause challenges must "respect a cross-purpose as well, for the Framers' distrust of economic Balkanization was limited by their federalism favoring a degree of local autonomy." *Davis*, 553 U.S. at 338. Thus, we must uphold a nondiscriminatory law against a dormant Commerce Clause challenge "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

In *Rocky Mountain*, we considered a challenge to the California LCFS, on which the district court accurately noted the Oregon program was modeled and to which it is analogous in all relevant respects. As in the Oregon program, parties regulated under the LCFS generate credits or deficits based on their carbon intensity scores, which are calculated through a GREET modeling tool. *Rocky Mountain*, 730 F.3d at 1080–82. In *Rocky Mountain*, we largely upheld the LCFS against a Commerce Clause challenge, remanding for further proceedings on an issue not

addressed by the district court: whether the LCFS discriminated against out-of-state ethanol in purpose or effect. *Id.* at 1078.**[8]**

We thus begin from the premise established in *Rocky Mountain*: state regulation violates the dormant Commerce Clause if it discriminates against out-of-state economic interests (in either purpose or effect) or if it regulates conduct occurring entirely outside of a state's borders. *Id.* at 1087, 1101–02. In contrast, we will uphold regulations that accord all fuels "the substantially evenhanded treatment demanded by the Commerce Clause." *Id.* at 1094 (quoting *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 332 (1977)).

## A. Discrimination

### i. Facial Discrimination

American Fuel's claim that the Program facially discriminates against out-of-state fuels by assigning petroleum and Midwest ethanol higher carbon intensities

---

**[8]** On remand, the district court concluded that the Program did not discriminate in purpose or effect against out-of-state petroleum. *Rocky Mountain Farmers Union v. Goldstene*, No. 1:09-cv-02234, 2014 WL 7004725, at *14–15 (E.D. Cal. Dec. 11, 2014). The court later held that the Program did not purposefully discriminate against out-of-state ethanol, but, because of changes in the manner in which California calculated its carbon intensity scores, twice denied motions to dismiss the claim that the Program had a discriminatory effect on out-of-state ethanol. *Rocky Mountain Farmers Union v. Corey*, 258 F. Supp. 3d 1134, 1158, 1163 (E.D. Cal. 2017); Memorandum Decision and Order, *Rocky Mountain Farmers Union v. Corey*, No. 1:09-cv-02234-LJO-BAM (E.D. Cal. Aug. 3, 2015), ECF No. 343. These subsequent denials are discussed in greater depth in Part II(A)(iii)(a), *infra*. The plaintiffs voluntarily dismissed their remaining claims and filed an appeal, which is pending in this court.

than Oregon biofuels is squarely controlled by *Rocky Mountain*.  Like its California counterpart, the Oregon program discriminates against fuels based on lifecycle greenhouse gas emissions, not state of origin.  *See Rocky Mountain*, 730 F.3d at 1090.

A state may not discriminate "against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently."  *City of Philadelphia v. New Jersey*, 437 U.S. 617, 626–27 (1978).  But, the Oregon program distinguishes among fuels not on the basis of origin, but rather on carbon intensity.  Out-of-state fuels are not necessarily disfavored: when the complaint was filed, the Program assigned twelve out-of-state ethanols, including five Midwest ethanols, lower carbon intensities than those assigned to Oregon biofuels.[9]  The fact that the Program labels fuels by state of origin does not render it discriminatory, as these labels are not the basis for any differential treatment.  *See Rocky Mountain*, 730 F.3d at 1097 ("California's reasonable decision to use regional categories in its default pathways . . . does not transform its evenhanded treatment of fuels based on their carbon intensities into forbidden discrimination.").

### ii.  Discriminatory Purpose

Citing statements by former Oregon Governor John Kitzhaber and various Oregon legislators, American Fuel next alleges that the Oregon program was enacted with the

---

[9] More recent carbon intensity scores—including those submitted with American Fuel's motion for judicial notice—also make plain that out-of-state fuels are not systematically disfavored.  *See* Or. Admin. R. 340-253-8030, -8040.

intent to "foster Oregon biofuels production at the expense of existing out-of-state fuel producers." But, the stated purpose of the Program is simply to "reduce Oregon's contribution to the global levels of greenhouse gas emissions and the impacts of those emissions in Oregon"—in particular, to "reduce the amount of lifecycle greenhouse gas emissions per unit of energy by a minimum of 10 percent below 2010 levels by 2025." Or. Admin. R. 340-253-0000(1), (2). "We will 'assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces us to conclude that they could not have been a goal of the legislation.'" *Rocky Mountain*, 730 F.3d at 1097–98 (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981)).

The district court did not err in finding that the statements by Oregon public officials cited in American Fuel's complaint do not demonstrate that the objectives identified by the legislature were not the true goals of the Program. Even construing the allegations in the complaint in the light most favorable to American Fuel, the statements cited, "do not plausibly relate to a discriminatory design and are 'easily understood, in context, as economic defense of a [regulation] genuinely proposed for environmental reasons.'" *Id.* at 1100 n.13 (alteration in original) (quoting *Clover Leaf Creamery Co.*, 449 U.S. at 463 n.7). The statements of the Oregon officials are no more probative of a discriminatory or protectionist purpose than the statements by California state officials we found insufficient to establish discriminatory purpose in *Rocky Mountain*. *Id.*[10]

---

[10] *Compare* Mem. in Supp. of Mot. Summ. J., *Rocky Mountain Farmers Union v. Goldstene*, No. 1:09-cv-02234-LJO-BAM (E.D. Cal.

None of the statements cited by American Fuel undermines the Oregon program's stated purpose. One of the allegedly discriminatory statements of former Governor Kitzhaber, for example, explicitly attributed the Program's favorable treatment of biofuels to the fact that "natural gas transmissions and generation emit 50 percent less greenhouse gas than burning coal." *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007))).

Our federal system recognizes "each State's freedom to 'serve as a laboratory; and try novel social and economic

---

Nov. 1, 2010), ECF No. 112 (quoting remarks by California state officials promoting the benefits of the LCFS, including the prospect that the program would "keep more money in the State" and "ensure that a significant portion of the biofuels used in the LCFS are produced in California"), *with* Compl., *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, No. 3:15-cv-00467-AA (D. Or. March 23, 2015), ECF No. 1 (citing statements by former Governor Kitzhaber that the Oregon program would "provide important economic benefits to Oregon's economy" and "keep capital circulating in our region through local sourcing and supply chains while reducing our dependence on carbon-intensive fuels." (quoting J. Kitzhaber, *10-Year Energy Action Plan 37* (Dec. 14, 2012))).

American Fuel also cites a statement from an advisory committee member that the LCFS "will create net jobs, make net improvements for household income, and be beneficial for Oregon's Gross State Product." *See* Advisory Final Report, Appx. A, Summary of Advisory Committee Input at 142 (2010), http://library.state.or.us/repository/2011/20110208 1424462/appendixA.pdf. These statements merely represent feedback and recommendations from stakeholders consulted during the rulemaking process; under the same subheading, another committee member offered the critique that "more can be done to incentivize low carbon fuels within the state." *Id.*

experiments.'" *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 50 (1973) (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 280 (1932) (Brandeis, J., dissenting)).  This freedom would be meaningless if officials could not promote the economic benefits of these experiments to their states without running afoul of the Commerce Clause.  For this reason, regulations "justified by a valid factor unrelated to economic protectionism" are permissible, even if they benefit a state's economy.  *New Energy Co.*, 486 U.S. at 274.

It is well settled that the states have a legitimate interest in combating the adverse effects of climate change on their residents.  *Massachusetts v. EPA*, 549 U.S. 497, 522–23 (2007).  "Air pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state."  *Exxon Mobil Corp. v. U.S. Envtl. Prot. Agency*, 217 F.3d 1246, 1255 (9th Cir. 2000). The complaint does not allege that the Oregon program was enacted for the purpose of supporting a uniquely local industry.  *Cf. Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 271 (1984) (finding a discriminatory purpose behind tax exemptions for two liquors produced in Hawaii because it was "undisputed that the purpose of the exemption was to aid Hawaiian industry").  The district court therefore correctly rejected the argument that the complaint plausibly alleged that the Program was discriminatory in purpose.

### iii.  Discriminatory Effect

A facially neutral statute can violate the Commerce Clause if it effectuates "differential treatment of in-state and out-of-state interests that benefits the former and burdens the latter."  *Or. Waste Sys., Inc.*, 511 U.S. at 99.  But, even assuming that the in-state and out-of-state fuels at issue in this case are similarly situated, American Fuel's complaint

does not state a claim based on discriminatory effects. *See Rocky Mountain*, 730 F.3d at 1089 ("All factors that affect carbon intensity are critical to determining whether the Fuel Standard gives equal treatment to similarly situated fuels.").

### a.   Burdens on Out-of-State Fuels

American Fuel argues that the Program's assignment of credits and deficits creates an impermissible burden on producers or importers of petroleum and Midwest ethanols, who must purchase credits, and provides an impermissible benefit to Oregon biofuel producers, who can generate and can sell credits. The argument fails. On its face, the Oregon program assigns credits and deficits to fuels evenhandedly based on a "reason, apart from [their] origin": carbon intensity. *Or. Waste Sys., Inc.*, 511 U.S. at 101 n.5. The number of credits assigned to fuels does not depend on their state of origin. *See also Rocky Mountain*, 730 F.3d at 1089 (finding no discrimination under the LCFS, which "does not base its treatment on a fuel's origin but on its carbon intensity").

And, American Fuel has not plausibly alleged that the application of these neutral criteria has a discriminatory effect. Many out-of-state producers generate credits, and several fare better in this respect than Oregon producers of the same fuels. Indeed, even factoring in transportation emissions does not neatly divide in-state and out-of-state producers, because "[t]ransportation emissions reflect a combination of: (1) distance traveled . . . ; (2) total mass and volume transported; and (3) efficiency of the method of transport." *Id.* at 1083; *see, e.g.*, State of Or. Dep't of Envtl. Quality, Oregon-Approved Carbon Intensity Values for 2016 (2016) (hereinafter "ODEQ 2016 Report") (assigning lower carbon-intensity scores to renewable diesels and biofuels from Arkansas, Louisiana, Texas, South Korea,

China, and Canada than to Oregon biofuels, and lower carbon-intensity scores to numerous out-of-state ethanols than to Oregon-produced ethanols); Or. Admin. R. 340-253-8030, -8040. Given its scoring system, the Program does not require or even incentivize "an out-of-state operator to become a resident in order to compete on equal terms." *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963).

Under the Oregon program, producers of higher carbon-intensity fuels are disfavored relative to *all* lower carbon-intensity fuels, including those produced outside of Oregon. This is plainly permissible. A state "may regulate with reference to local harms, structuring its internal markets to set incentives for firms to produce less harmful products for sale" within its borders. *Rocky Mountain*, 730 F.3d at 1104; *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978) (holding that "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another"). The Commerce Clause "protects the interstate market, not particular interstate firms." *Exxon Corp.*, 437 U.S. at 127.

American Fuel alleges that "to compete in the Oregon market, producers of high carbon-intensity fuels must change the manner in which they produce and transport fuels to obtain lower carbon-intensity scores to avoid the commercial disadvantage placed on their higher carbon-intensity fuels." But this allegation merely affirms that the Program targets differences in production methods that affect greenhouse gas emissions "based on the real risks posed by different sources of generation," something we have squarely held "is not a dormant Commerce Clause violation." *Rocky Mountain*, 730 F.3d at 1092.

This is because the OR-GREET model considers in its calculation of carbon intensities emissions from the growth of inputs into the production of fuels, such as corn; efficiency of production, including electricity or fuel used for energy; milling processes; conversion of land for production; and transportation of fuels and feedstock into its calculations of carbon intensities. *See id.* at 1082–83 (upholding use of analogous GREET model in regulation in California). Accordingly, carbon intensity scores for ethanol vary widely under the Oregon program, ranging in January 2016 from 7.49 (Brazilian sugarcane ethanol) to as high as 98.59 (Midwest coal ethanol). *See* State of Or. Dep't of Envtl. Quality, Oregon-Approved Carbon Intensity Values for 2016 (2016). But, some of the lowest carbon intensity scores are also assigned to Midwest producers. *See id.* at 8–11 (assigning values to Midwest ethanols ETHC036, ETHC056, ETCH073-75, and ETHC089-90 lower than the value of Oregon ethanol). "The dormant Commerce Clause does not require [a state] to ignore the real differences in carbon intensity among out-of-state ethanol pathways," including emissions from transporting fuels and other "important contributors to GHG emissions." *Rocky Mountain*, 730 F.3d at 1088, 1093.

Nor does the Oregon program eliminate a competitive advantage that producers of higher carbon-intensity fuels have earned. *Cf. Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 351 (1977) (striking down a North Carolina regulation that had "the effect of stripping away from the Washington apple industry the competitive and economic advantages it has earned for itself through its expensive inspection and grading system"). A state may favor environmentally friendly production methods over others with more harmful effects. *See Clover Leaf Creamery Co.*, 449 U.S. at 473. And, "[a]ccess to cheap electricity is an

advantage, but it was not 'earned' . . . simply because ethanol producers built their plants near coal-fired power plants and imposed the hidden costs of GHG emissions on others." *Rocky Mountain*, 730 F.3d at 1092; *see id.* at 1091–92 ("Drawing electricity from the coal-fired grid might be the easiest and cheapest way to power an ethanol plant. But the dormant Commerce Clause does not guarantee that ethanol producers may compete on the terms they find most convenient."); *see also Exxon Corp.*, 437 U.S. at 127 (holding that the Commerce Clause does not protect "the particular structure or methods of operation in a retail market").

On remand, the *Rocky Mountain* district court held that American Fuel had plausibly alleged a discriminatory effect on out-of-state ethanol in California from the California program. *Rocky Mountain Farmers Union*, 258 F. Supp. 3d at 1163; Mem. Decision & Order, *Rocky Mountain Farmers Union v. Corey*, No. 1:09-cv-02234-LJO-BAM (E.D. Cal. Aug. 3, 2015), ECF No. 343. But, that finding is of no aid to American Fuel here, as it was based on an allegation that California had changed the way it calculated carbon intensity scores so as to "assign artificially lower CI scores to California-produced ethanol while assigning artificially higher CI scores to ethanol produced elsewhere, particularly in the Midwest." *Rocky Mountain Farmers Union*, 258 F. Supp. 3d at 1159. There is no allegation of a similar change here. Nothing in the complaint in this case suggests that Midwest ethanol's scores are "artificially" high—only that they are higher than the scores of fuels that generate lower greenhouse gas emissions.

### b. In-State Benefits

American Fuel also alleges that the Program impermissibly benefits in-state entities because Oregon

biofuels producers can generate credits.  But, any benefits conferred on Oregon biofuels producers arise from the relatively low carbon intensity of their products.  The Program assigns lower carbon intensity scores to *all* biofuels (regardless of state of origin) in comparison to other fuels because of their lower greenhouse gas emissions.  *See, e.g.*, ODEQ 2016 Report; Or. Admin. R. 340-253-8030, -8040.  Such factors "are not discriminatory because they reflect the reality of assessing and attempting to limit GHG emissions." *Rocky Mountain*, 730 F.3d at 1093.

And, biofuels are not a "uniquely local industry" to Oregon.  *Id.* at 1100; *cf. Bacchus*, 468 U.S. at 271 (finding the effect of a tax exemption "clearly discriminatory, in that it applies only to locally produced beverages").  As the district court explained, some of the fuels "most desirable from a carbon intensity standpoint" are out-of-state biofuels. Judgment, *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, No. 3:15-cv-00467-AA (D. Or. March 23, 2015), ECF No. 72. The Program thus does not favor in-state biofuels over similar out-of-state biofuels, which renders this case fully distinguishable from *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 188 (1994), upon which the dissent relies.  In that case, a Massachusetts tax on in-state and out-of-state milk dealers was used to fund a subsidy exclusively for in-state milk producers.  *See* 512 U.S. at 190–91.  Under the structure of the Oregon Program, however, out-of-state producers are able to—and do—generate credits and thus share in the Program's benefits.  As the district court noted, the Program "rewards all investment in innovative fuel production, irrespective of where that innovation occurs." *See* ODEQ 2016 Report.  In contrast, the subsidies at issue in *West Lynn Creamery* were distributed explicitly and exclusively to in-state producers based on geography alone. *See* 512 U.S. at 190–91, 196–97.

Thus, the pleadings do not provide a plausible basis from which to infer that the Program will shift market shares to *in-state biofuel producers*, as opposed to biofuel producers in general.  *See Exxon Corp*., 437 U.S. at 126 (holding that a law did not discriminate against out-of-state refiners because "in-state independent dealers will have no competitive advantage over out-of-state dealers"); *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1231–32 (9th Cir. 2010).  The fact that some burdens of Oregon's program "fall[] on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp.*, 437 U.S. at 126.[11]

### c.  *Pike* Analysis

"A nondiscriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry." *Clover Leaf Creamery Co.*, 449 U.S. at 474.  Such a regulation "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.  Although American Fuel alleges that the Program "imposes economic and administrative burdens on regulated parties" because importers of petroleum-based gasoline and diesel "must either change the composition of

---

[11] The fact that Oregon does not have a petroleum industry that is burdened under the Program does not support American Fuel's discrimination claims.  We have previously upheld, for example, an Arizona regulation that could shift market share away from large wineries even though the state had only one large winery that would be burdened under the regulation. *See Black Star Farms*, 600 F.3d at 1227–29.  The regulations show that the Program "'regulates evenhandedly' . . . without regard" to a regulated party's origin. *Clover Leaf Creamery Co.*, 449 U.S. at 471–72.

the fuel they import or purchase credits," it fails to plausibly allege that this burden is "'clearly excessive' in light of the substantial state interest" in mitigating the environmental effects of greenhouse gas emissions from transportation fuels. *Clover Leaf Creamery Co.*, 449 U.S. at 473.

## B. Extraterritorial Effect

The dormant Commerce Clause also prohibits a state from regulating conduct that "takes place wholly outside of the State's borders." *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc) (quoting *Healy v. Beer Inst*., 491 U.S. 324, 336 (1989)). American Fuel alleged that the Oregon program violates the Commerce Clause and "principles of interstate federalism" by attempting to control "commerce occurring wholly outside the boundaries" of the state. *Healy*, 491 U.S. at 336. But, these claims are squarely barred by *Rocky Mountain. See* 730 F.3d at 1101 ("Firms in any location may elect to respond to the incentives provided by the Fuel Standard if they wish to gain market share in California, but no firm must meet a particular carbon intensity standard, and no jurisdiction need adopt a particular regulatory standard for its producers to gain access to California."). Like the LCFS, the Program expressly applies only to fuels sold in, imported to, or exported from Oregon. Or. Admin. R. 340-253-0100(1).

American Fuel contends that its claim based on principles of interstate federalism raises issues not considered in *Rocky Mountain*. However, as the district court correctly noted, "irrespective of its constitutional basis, any such claim is necessarily contingent upon a finding that the Oregon program regulates and attempts to control conduct that occurs in other states." *See Rocky Mountain Farmers Union*, 2014 WL 7004725, at *13–14 (denying

leave to amend on remand to add claim alleging that the LCFS was unconstitutional under principles of interstate federalism because claim was based on same premise as an extraterritorial legislation claim). Because the Program does not legislate extraterritorially, American Fuel's claim fails no matter how its constitutional claim is labelled.

## C. Preemption

Finally, American Fuel alleges that the Oregon program is preempted by § 211 of the CAA. That Act recognizes that "air pollution control at its source is the primary responsibility of States and local governments," 42 U.S.C. § 7401(a)(3), but preempts state regulation of a fuel or fuel component if the EPA Administrator has declared regulation unnecessary:

> Except as otherwise provided in subparagraph (B) or (C), no State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine—
>
> > (i)  if the Administrator has found that no control or prohibition of the characteristic or component of a fuel or fuel additive under paragraph (1) is necessary and has published his finding in the Federal Register . . . .

42 U.S.C. § 7545(c)(4)(A).

American Fuel contends that the EPA has found regulation of methane is unnecessary because it excluded methane from the definition of volatile organic compounds under § 211(k) of the CAA in light of its low reactivity. *See* 40 C.F.R. pt. 80 (1994); 42 U.S.C. § 7545(k). The CAA, however, makes plain that the administrator must find that "no control or prohibition . . . under" § 211(c) is necessary in order to effect preemption. The EPA's decision not to regulate methane under § 211(k) is not a finding that regulating methane's contributions to greenhouse gas emissions is unnecessary, and thus is not preemptive under § 211(c)(4)(A)(i).

### III.  Conclusion

For the reasons above, we **AFFIRM** the judgment of the district court.

N.R. SMITH, Circuit Judge, dissenting:

I cannot agree to dismiss American Fuel's claim,[1] alleging that the practical effect of Oregon's Clean Fuels Program (the "Oregon program") impermissibly favors in-state interests at the expense of out-of-state interests.

## I.

Where "a statute discriminates against out-of-state entities . . . in its practical effect, it is unconstitutional unless it 'serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means.'" *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)).

In *Rocky Mountain*, we followed the Supreme Court's decision in *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994). *See* 730 F.3d 1098–1100. There the Supreme Court struck down as "clearly unconstitutional" a facially neutral state pricing order that imposed a tax on all milk produced for consumption in Massachusetts while also providing a subsidy "exclusively to Massachusetts dairy farmers" that "entirely (indeed more than) offset" the tax for in-state producers. *W. Lynn Creamery*, 512 U.S. at 194. By increasing the competitiveness of in-state industry at the

---

[1] I agree with the majority that *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013), resolved many of the issues presented in this case. Nonetheless, although bound by our circuit precedent, I continue to believe that the incorporation of location and distance data into the calculation of carbon intensity values is facially discriminatory under the Supreme Court's Commerce Clause analysis. *See Rocky Mountain Farmers Union v. Corey*, 740 F.3d 507, 515–16 (9th Cir. 2014) (M. Smith dissenting from denial of rehearing en banc).

expense of out-of-state industry, Massachusetts "neutraliz[ed] advantages belonging to the place of origin." *Id.* at 196 (quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 527 (1935)). The Supreme Court explained that

> [n]ondiscriminatory measures, like the evenhanded tax at issue here, are generally upheld, in spite of any adverse effects on interstate commerce, in part because the existence of major in-state interests adversely affected is a powerful safeguard against legislative abuse. . . . However, when a nondiscriminatory tax is coupled with a subsidy to one of the groups hurt by the tax, a State's political processes can no longer be relied upon to prevent legislative abuse, because one of the in-state interests which would otherwise lobby against the tax has been mollified by the subsidy.

*Id.* at 200 (original alterations and internal quotation marks omitted).

In *Rocky Mountain*, we applied the West Lynn Creamery Rule in evaluating the constitutionality of California's clean fuels program (which the Oregon law models). 730 F.3d at 1098–1100. There we determined that the California law burdened more in-state industry than it benefitted. *See id.* at 1099. Importantly, that conclusion was necessary to our decision that California's law did not violate the principles in *West Lynn Creamery*. *See id.* at 1098–1100.

In its opinion the majority fails to grapple with the Oregon program's *West Lynn Creamery* problem. That decision causes them to err as is shown below.

## II.

Again, to state a plausible claim for discrimination, American Fuel must allege that (A) the Oregon program discriminates against out-of-state interests in its practical effect, and (B) Oregon's legitimate interest in reducing global warming could be addressed by non-discriminatory means.

Further, as an initial matter in evaluating American Fuel's claim, this case is distinguished from *Rocky Mountain* because it comes before us on a motion to dismiss, not summary judgment. The evidentiary record has not been developed in discovery. Thus, we must take all factual allegations and reasonable inferences therefrom in the light most favorable to American Fuel. *See Adams v. U.S. Forest Serv.*, 671 F.3d 1138, 1142–43 (9th Cir. 2012).

## A.

American Fuel's pleadings plausibly allege that Oregon's program discriminates in its practical effect. First, Oregon's program assigns a carbon intensity[2] to all transportation fuels produced for in-state consumption. The program then sets a maximum carbon intensity value. Fuels with a carbon intensity level above the maximum allowed carbon intensity value generate deficits and fuels with intensity levels below this value generate credits. Oregon also requires producers with deficits to off-set those deficits by purchasing credits from competing fuel producers that have generated credits under the law.

---

[2] The Carbon intensity value is based on a formula aimed at assessing the carbon footprint of each fuel from production through its ultimate consumption.

As American Fuel alleges, the discrimination arises from Oregon's decision to draw the maximum allowed carbon intensity value in such a manner that *all in-state* fuel producers generate credits and only out-of-state fuel producers generate deficits. As a practical matter, this not only exempts in-state entities from any burden under the law (to remedy deficits by purchasing credits from competitors), but it also affords them an additional subsidy in the form of valuable carbon credits. By contrast, out-of-state regulated entities, including American Fuel, generate deficits and experience the full impact of the law.[3]

Thus, like the tax and subsidy in *West Lynn Creamery*, Oregon's program discriminates in its practical effect. *See* 512 U.S. at 200. Out-of-state entities bear the full brunt of the law's burden, even though all fuel producers (including in-state entities) contribute to greenhouse gas emissions (and consequently global warming). At the same time, in-state entities not only avoid the burden of the law, they also receive a subsidy from the out-of-state entities in the sale of their valuable credits. Thus, American Fuel plausibly alleges that the Oregon program discriminates in its practical effect.

## B.

It is also plausible that there are nondiscriminatory means of advancing Oregon's legitimate interest in combating global warming. *See Rocky Mountain*, 730 F.3d at 1087, 1106 (identifying legitimate state interests in addressing global warming). To state a plausible claim, it is

---

[3] As the majority is quick to note, there are some out-of-state entities that also generate credits. But the Commerce Clause problem emphasized in the *West Lynn Creamery* analysis was the uniform absence of an in-state burden—not the presence of a uniform burden on out-of-state interests. *See* 512 U.S. at 200.

unnecessary to identify every "available nondiscriminatory means" of accomplishing the goal of reducing greenhouse gases. *See id.* at 1087 (quoting *Taylor*, 477 U.S. at 138). However, it is easy to suggest one plausible example. Oregon could simply adopt a per unit tax on carbon intensity. Such a tax would discourage use of carbon intense fuels without artificially shielding in-state interests from any responsibility for their contributions to greenhouse gas emissions. The availability of nondiscriminatory means of addressing global warming plausibly establishes that the discriminatory effect of Oregon's law violates the Commerce Clause.

### III.

There is no doubt American Fuel alleges a plausible claim. Taken together, the discriminatory practical effect of Oregon's program and the availability of nondiscriminatory alternatives plainly state a claim under the Commerce Clause that ought to survive a motion to dismiss.