**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROCKY MOUNTAIN FARMERS UNION;
REDWOOD COUNTY MINNESOTA
CORN AND SOYBEAN GROWERS;
PENNY NEWMAN GRAIN, INC.; REX
NEDEREND; FRESNO COUNTY FARM
BUREAU; NISEI FARMERS LEAGUE;
CALIFORNIA DAIRY CAMPAIGN;
GROWTH ENERGY,
    *Plaintiffs-Appellants*,

and

AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS ASSOCIATION,
FKA National Petrochemical &
Refiners Association; AMERICAN
TRUCKINGS ASSOCIATIONS; THE
CONSUMER ENERGY ALLIANCE,
    *Plaintiffs*,

v.

RICHARD W. COREY, in his official
capacity as Executive Officer of the
California Air Resources Board;
ALEXANDER SHERRIFFS; BARBARA
RIORDAN; HECTOR DE LA TORRE;
JOHN EISENHUT; JOHN GIOIA; MARY
D. NICHOLS; RON ROBERTS; DANIEL

No. 17-16881

D.C. Nos.
1:09-cv-02234-
LJO-BAM
1:10-cv-00163-
LJO-BAM

SPERLING; SANDRA BERG; JOHN R.
BALMES; PHIL SERNA; DEAN
FLOREZ; DIANE TAKVORIAN; JUDY A.
MITCHELL, in their official capacities
as members of the California Air
Resources Board; GAVIN NEWSOM,
in his official capacity as Governor
of the State of California; XAVIER
BECERRA, in his official capacity as
Attorney General of the State of
California,
                    *Defendants-Appellees*,


SIERRA CLUB; CONSERVATION LAW
FOUNDATION; ENVIRONMENTAL
DEFENSE FUND; NATURAL
RESOURCES DEFENSE COUNCIL,
        *Intervenor-Defendants-Appellees.*

ROCKY MOUNTAIN FARMERS UNION;
REDWOOD COUNTY MINNESOTA
CORN AND SOYBEAN GROWERS;
PENNY NEWMAN GRAIN, INC.; REX
NEDEREND; FRESNO COUNTY FARM
BUREAU; NISEI FARMERS LEAGUE;
CALIFORNIA DAIRY CAMPAIGN;
GROWTH ENERGY,

*Plaintiffs*,

and

AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS ASSOCIATION,
FKA National Petrochemical &
Refiners Association; AMERICAN
TRUCKINGS ASSOCIATIONS; THE
CONSUMER ENERGY ALLIANCE,

*Plaintiffs-Appellants*,

v.

RICHARD W. COREY, in his official
capacity as Executive Officer of the
California Air Resources Board;
ALEXANDER SHERRIFFS; BARBARA
RIORDAN; HECTOR DE LA TORRE;
JOHN EISENHUT; JOHN GIOIA; MARY
D. NICHOLS; RON ROBERTS; DANIEL
SPERLING; SANDRA BERG; JOHN R.
BALMES; PHIL SERNA; DEAN
FLOREZ; DIANE TAKVORIAN; JUDY A.
MITCHELL, in their official capacities
as members of the California Air

No. 17-16882

D.C. Nos.
1:09-cv-02234-
LJO-BAM
1:10-cv-00163-
LJO-BAM

OPINION

Resources Board; GAVIN NEWSOM,
in his official capacity as Governor
of the State of California; XAVIER
BECERRA, in his official capacity as
Attorney General of the State of
California,

*Defendants-Appellees*,

SIERRA CLUB; CONSERVATION LAW
FOUNDATION; ENVIRONMENTAL
DEFENSE FUND; NATURAL
RESOURCES DEFENSE COUNCIL,
*Intervenor-Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, Chief Judge, Presiding

Argued and Submitted September 26, 2018
Pasadena, California

Filed January 18, 2019

Before:  Dorothy W. Nelson, Ronald M. Gould,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Gould

# SUMMARY[*]

## Civil Rights

The panel vacated in part and affirmed in part the district court's judgment on the pleadings and Fed. R. Civ. P. 12(b)(6) dismissal of an action alleging that the previous and current versions of California's Low Carbon Fuel Standard violate the Commerce Clause and the "federal structure of the Constitution."

Plaintiffs challenged three iterations of California Air Resources Board regulations aimed at accomplishing the goal of reducing the rate of greenhouse gas emissions in California's transportation sector: (1) the first Low Carbon Fuel Standard, which went into effect in 2011; (2) the Low Carbon Fuel Standard, as amended in 2012; and (3) the 2015 Low Carbon Fuel Standard. The 2011 Low Carbon Fuel Standard established a program for the regulation of Californian transportation fuels based on a fuels' "carbon intensity." The 2015 Low Carbon Fuel Standard repealed the 2011 Low Carbon Fuel Standard and the 2012 amendments.

The panel held that plaintiffs' challenges to the 2011 and 2012 versions of the Low Carbon Fuel Standard were made moot by their repeal. The panel therefore vacated the district court's judgment as to those challenges and remanded with instructions to dismiss those claims.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Affirming the district court's decision as to the claims challenging the 2015 Low Carbon Fuel Standard, the panel held that the claims were largely precluded by this Court's prior decision in *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013). The panel held that, practically speaking, the controlling substance at the crux of the case had not changed since 2011. The panel noted that the 2015 Fuel Standard still uses a lifecycle analysis to assign credits and deficits, and although some details had changed, plaintiffs did not and could not explain how their extraterritoriality claims under the Commerce Clause functioned differently against the new version of the regulation.

The panel rejected plaintiffs' assertion that their claims were based on the "federal structure of the Constitution" and therefore were not controlled by *Rocky Mountain*. The panel held that plaintiffs had not identified which constitutional provisions or doctrine outside the Commerce Clause governed their structural federalism claims. Moreover, the panel held that it was bound by recent Circuit precedent that settled whether a program very similar to the Low Carbon Fuel Standard was inconsistent with the structure of the Constitution. *See Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903 (9th Cir. 2018). Finally, the panel rejected plaintiffs' claim that the 2015 Low Carbon Fuel Standard facially discriminated against interstate commerce in its treatment of ethanol and crude oil or that it purposefully discriminated against out-of-state ethanol.

**COUNSEL**

Paul J. Zidlicky (argued), Clayton G. Northouse, and Erika L. Maley, Sidney Austin LLP, Washington, D.C.; John C. O'Quinn, Kirkland & Ellis LLP, Washington, D.C.; John P. Kinsey and Timothy Jones, Wagner Jones Helsley PC, Fresno, California; for Plaintiffs-Appellants.

M. Elaine Meckenstock (argued), Jonathan Wiener, and Myung J. Park, Deputy Attorneys General; Gavin G. McCabe, Supervising Attorney General; Robert W. Byrne, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Oakland, California; Sean H. Donahue, Donahue Goldberg & Weaver LLP, Washington, D.C.; Joanne Spalding, Sierra Club, Oakland, California; David Pettit, Natural Resources Defense Council, Santa Monica, California; for Defendants-Appellees.

**OPINION**

GOULD, Circuit Judge:

In 2013, we decided the first appeal in a long-running, complex challenge to California's Low Carbon Fuel Standard (LCFS) under the Commerce Clause in *Rocky Mountain Farmers Union v. Corey*, rejecting some of Plaintiffs' claims and remanding for further proceedings on others. *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013) *reh'g en banc denied*, 704 F.3d 507 (9th Cir. 2014), *and cert. denied*, 134 S. Ct. 2875 (2014) (hereinafter *Rocky Mountain I*). That challenge returns to us today. In the intervening years, the LCFS has been repealed and replaced, and Plaintiffs' claims have changed form, but

both the regulations and the claims have the same core structure now as they did then.  We hold that Plaintiffs' challenges to previous versions of the LCFS have been made moot by their repeal, and we affirm the dismissal of their remaining claims against the present version of the LCFS as largely precluded by our prior decision in *Rocky Mountain I*. To the extent Plaintiffs raise new arguments on this appeal, we conclude that they are without merit.

# I

## A

Since 2006, the California Air Resources Board (CARB) has acted under a mandate to reduce California's rate of greenhouse gas emissions in light of the California legislature's finding that "[g]lobal warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California."  Cal. Health & Safety Code § 38501.  The California legislature is rightly concerned with the health and welfare of humans living in the State of California.  These persons may be subjected, for example, to crumbling or swamped coastlines, rising water, or more intense forest fires caused by higher temperatures and related droughts, all of which many in the scientific communities believe are caused or intensified by the volume of greenhouse gas emissions.[1]  The California legislators and

---

[1] *See generally* Intergovernmental Panel on Climate Change, *Global Warming of 1.5 °C* (2018), http://www.ipcc.ch/report/sr15/; *see also* Coral Davenport, *Major Climate Report Describes a Strong Risk of Crisis as Early as 2040*, N.Y. Times (Oct. 7, 2018), https://www.nytimes.com/2018/10/07/climate/ipcc-climate-report-2040.html; Seth Bornstein & Frank Jordans, '*Weirdness Abounds' as World Warms; Scientists Say Record Temps, Fires Made Worse by*

regulators who created the CARB regulation of greenhouse gas emissions were clearly concerned with such dreadful environmental impacts.[2]  And, whatever else may be said of the revolutionary colonists who framed our Constitution, it cannot be doubted that they respected the rights of individual states to pass laws that protected human welfare, [3] *see, e.g.*, *The Federalist No. 45* at 289 (James Madison) (Clinton Rossiter ed., 2003) ("The powers reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people; and the internal order, improvement, and

---

*Human-Caused Climate Change*, Chicago Tribune, Aug. 1, 2018, at C12.

[2] *See* S. Rules Comm., *A. Floor Bill Analysis on A.B. 32*, 2005–2006 Leg., Reg. Sess. (Cal. 2006), http://leginfo.legislature.ca.gov/faces/bill AnalysisClient.xhtml?bill_id=200520060AB32;  (discussing passage of a bill to *inter alia* authorize CARB to regulate greenhouse gas emissions from transportation fuels, stating that "global climate change poses a serious threat to California's economic well being, public health, and environment if aggressive actions to reduce GHG emissions are not taken soon"), Cal. Envtl. Prot. Agency Air Res. Bd., *Staff Report: Initial Statement of Reasons for Proposed Rulemaking – Proposed Re-Adoption of the Low Carbon Fuel Standard* ES-1–2 (Dec. 2014), https://www.arb.ca.gov/regact/2015/lcfs2015/lcfs15isor.pdf  ("The primary goal of the LCFS regulation is to reduce the carbon intensity of transportation fuels used in California . . . thereby reducing GHG emissions . . . .").

[3] Blackstone referred to the traditional authority of the police power as the power to ensure "the due regulation and domestic order of the kingdom." 4 William Blackstone, *Commentaries* *162. Bentham's work on constitutional codes similarly defined the police power as "a system of precaution, either for the prevention of crimes or of calamities." 3 Jeremy Bentham, *The Works of Jeremy Bentham* *169 (John Bowring ed., 1843) (later cited by *Tennessee v. Davis*, 100 U.S. 257, 300 (1879)). We cannot doubt that the calamities considered in this context are a central concern of the states as they wield this traditional power.

prosperity of the State."), and recognized their broad police powers to accomplish this goal. *See, e.g.*, *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" (quoting *Slaughter-House Cases*, 83 U.S. 36, 62 (1873))); *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36 (1980) ("[T]he States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected."); *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free [the air] from pollution . . . clearly falls within the exercise of even the most traditional concept of . . . the police power.").

We are presented with several versions of the challenged CARB regulations that regulate fuel sales in California.  This case concerns three iterations of CARB regulations aimed at accomplishing the goal of reducing the rate of greenhouse gas emissions in California's transportation sector: (1) the first LCFS, which went into effect in 2011; (2) the LCFS as amended in 2012; and (3) and the LCFS which replaced the first LCFS in 2015.

The function of the 2011 and 2012 versions of the LCFS was heavily discussed and analyzed in *Rocky Mountain I* and no current factual allegations have disturbed our summary of them.  *See Rocky Mountain I*, 730 F.3d at 1078–86 (9th Cir. 2013).  We reaffirm, finding *Rocky Mountain I*'s conclusions binding here.  *Id.* at 1106–07.

In brief, the 2011 LCFS established a program for the regulation of Californian transportation fuels based on the

fuels' "carbon intensity."[4] *See Rocky Mountain I*, 730 F.3d at 1080–81.  Parties who sell fuel in California are assessed for the carbon intensity of those fuels, and parties who fall below the carbon intensity standard gain tradeable credits that can be used by parties who are above the carbon intensity standard to meet their regulatory obligations. CARB assigns carbon intensity differently for different kinds of fuels, and the 2012 amendments to the LCFS, while retaining this basic structure, changed the precise procedure for assigning carbon intensity values to crude oil.

In 2013, after our decision in *Rocky Mountain I*, a decision in California state court based on the state's administrative law required CARB to reconsider the LCFS. *See POET, LLC v. CARB*, 218 Cal. App. 4th 681, 766–67 (2013) (requiring CARB to "[s]et aside its approval of the LCFS").  This led to the currently-effective LCFS (the "2015 LCFS") that repealed the 2011 LCFS and, of course, the 2012 amendments.  The method and structure of the 2015 LCFS is identical to the 2011 LCFS, and it still contains the central carbon intensity and lifecycle analysis elements.  The changes that are material for this appeal are limited to the

---

[4] A fuel's carbon intensity rating reflects the greenhouse gas emissions associated with the fuel throughout its total "lifecycle." Rather than measuring carbon released during the fuel's use, the lifecycle analysis examines the environmental impact of a product from "cradle to grave" by evaluating the resources consumed and wastes discharged during the product's production, distribution, use, maintenance, and disposal. *See generally* U.S. Dept. of Energy, *Ethanol: The Complete Energy Lifecycle Picture* (March 2007), https://www1.eere.energy.gov/vehiclesandfuels/pdfs/program/ethanol_brochure_color.pdf (providing an overview of the lifecycle analysis model).

process for assigning carbon intensity values to non-crude oil fuels.

The 2011 LCFS gave two different pathways for regulated parties to have the carbon intensity of their fuels assessed. Under "Method 1," CARB provided default values for different fuels with different production procedures from different parts of the country and the world. *Rocky Mountain I*, 730 F.3d at 1082. Regulated parties could also use "Method 2," which provided different options aimed at giving a more individualized assessment of a fuel's carbon intensity. *Id.* The 2015 LCFS abandons the Method 1 process and assigns an individualized carbon intensity to each fuel, streamlining the application process for some conventionally produced fuels that CARB had previous experience in evaluating. This change means that no part of the LCFS now refers to particular regions of origin, as the 2011 LCFS had. *See Rocky Mountain I*, 730 F.3d at 1081–84.

**B**

The first version of this case began in 2009 and 2010, when Plaintiffs-Appellants Rocky Mountain Farmers' Union et al. ("Rocky Mountain") and American Fuels & Petrochemical Manufacturers Association et al. ("American Fuels") separately challenged the 2011 LCFS under the Commerce Clause and the Supremacy Clause, bringing *Ex Parte Young* actions against CARB members, California's Governor, and California's Attorney General seeking declaratory and injunctive relief. Rocky Mountain argued that the 2011 LCFS was preempted by the Energy Independence and Security Act of 2007 (EISA), regulated commerce extraterritorially, unduly burdened interstate commerce, and discriminated against out-of-state fuel interests. American Fuels made the same claims and added

claims that the 2011 LCFS was preempted by the Energy Policy Act of 2005 and the federal Renewable Fuels Standard (RFS).

The district court granted summary judgment to the plaintiffs on Rocky Mountain and American Fuels's Commerce Clause claims and granted Rocky Mountain's motion for a preliminary injunction. *See Rocky Mountain Farmers Union v. Goldstene ("Rocky Mountain Ethanol")*, 843 F. Supp. 2d 1071, 1090, 1093 (E.D. Cal. 2011); *Rocky Mountain Farmers Union v. Goldstene ("Rocky Mountain Preemption")*, 843 F. Supp. 2d 1042, 1070 (E.D. Cal. 2011); *Rocky Mountain Farmers Union v. Goldstene ("Rocky Mountain Crude")*, Nos. CV-F-09-2234 LJO DLB, CV-F-10-163 LJO DLB, 2011 WL 6936368, at *12–14 (E.D. Cal. Dec. 29, 2011). The appeals of these orders were consolidated and heard by the Ninth Circuit in *Rocky Mountain I*. 730 F.3d at 1078.

In *Rocky Mountain I*, we reversed the district court, holding that the 2011 LCFS did not facially discriminate against interstate commerce in ethanol or crude oil, did not regulate extraterritorially, and did not discriminate in purpose or effect against crude oil. *Id.* at 1100, 1103–04, 1107. We also held that the LCFS permissibly regulated the in-state behavior of selling different mixtures of fuel, and that the use of lifecycle analysis did not amount to discrimination against interstate commerce because it disincentivized the purchase of a fuel only to the extent that that fuel was relevantly different with respect to California's legitimate interest in curbing greenhouse gas emissions and climate change. *Id.* at 1089–90. Plaintiffs' petition for rehearing en banc was denied, 704 F.3d 507 (9th Cir. 2014), as were petitions for a writ of certiorari from both Plaintiffs

and Defendants. *See* 134 S. Ct. 2875 (2014); *Corey v. Rocky Mountain Farmers Union*, 134 S. Ct. 2884 (2014).

Our panel remanded on the following issues: (1) whether the 2011 LCFS ethanol provisions discriminate in purpose or in effect, (2) whether the 2011 LCFS ethanol provisions unduly burden interstate commerce under *Pike v. Bruce Church*, *Inc.*, 397 U.S. 137 (1970), (3) whether the 2011 and 2012 LCFS crude oil provisions unduly burden interstate commerce under *Pike*, (4) whether the LCFS is preempted by the federal RFS and (5) whether the LCFS is preempted by the federal EISA. *Rocky Mountain I*, 730 F.3d at 1107; *see also Rocky Mountain Farmers Union v. Goldstene*, Nos. 1:09-cv-2234-LJO-BAM, 1:10-cv-163-LJO-BAM, 2014 WL 7004725, at *6 (E.D. Cal. Dec. 11, 2014) (hereinafter *Goldstene*) (summarizing the questions the district court received on remand).

## C

On remand, Plaintiffs' claims went through a series of amendments and decisions to reach their current form. In December of 2014, the district court granted in part a motion to amend American Fuels's complaint. This amendment resulted in a complaint that also challenged the 2012 amendments to the LCFS's crude oil provisions, added a "horizontal federalism" aspect to its extraterritoriality claim, and eliminated American Fuels's *Pike* and federal preemption claims. *See Goldstene*, 2014 WL 7004725, at *18.

The district court then further clarified its position by granting summary judgment for Defendants on Plaintiffs' extraterritoriality claim against the original LCFS, granting a motion to dismiss on Plaintiffs' extraterritoriality claim against the 2012 version of the LCFS, granting summary

judgment for Defendants on Plaintiffs' facial discrimination claims against the original LCFS with respect to ethanol, granting summary judgment for Defendants on all of Plaintiffs' discrimination claims against the original LCFS and the 2012 version with respect to crude oil, and denying a motion to dismiss Plaintiffs' claim that the original ethanol provisions discriminate in purpose and effect. *Am. Fuels & Petrochemical Mfrs. Ass'n v. Corey*, Nos. 1:09-cv-2234-LJO-BAM, 1:10-cv-163-LJO-BAM, 2015 WL 5096279, at *38–39 (Aug. 28, 2015).

The complaints were amended again to reflect the 2015 version of the LCFS, and the district court heard motions to dismiss and motions for judgment on the pleadings. The amended complaints alleged that all three versions of the LCFS are preempted by federal law, that all three versions are impermissible extraterritorial regulations, and that all three versions violate the Commerce Clause facially, in purpose and effect, and under the *Pike* balancing test, which remained in issue under the claims of Rocky Mountain despite prior dismissal in the American Fuels case. The district court held that Plaintiffs' claims against the repealed versions of the LCFS were not moot. Nevertheless, it granted Federal Rule of Civil Procedure 12(c) motions for judgment on the claims precluded by *Rocky Mountain I* and granted 12(b)(6) motions to dismiss on most of the other claims. The court denied the motions to dismiss on Plaintiffs' claims that the ethanol provisions of the 2011 and 2015 versions of the LCFS discriminate in practical effect and that they violate *Pike*. Rather than contest these remaining claims, Plaintiffs voluntarily dismissed them, and the district court entered a final judgment.

Plaintiffs now appeal the district court's decision on claims challenging the 2015 version of the LCFS, as well as

previous orders deciding the prior motions to dismiss. Appellants claim that all three versions of the LCFS violate the following constitutional protections:

(1) the Commerce Clause and "the federal structure of the Constitution" by regulating extraterritorially.

(2) the Commerce Clause by facially discriminating against interstate and foreign commerce in their treatment of crude oil and ethanol.

(3) the Commerce Clause by purposefully discriminating against interstate and foreign commerce in their treatment of crude oil and ethanol.

## II

We review legal conclusions concerning mootness *de novo* and factual findings concerning mootness for clear error. *In re Thorpe Insulation Co.*, 677 F.3d 869, 879 (9th Cir. 2012). We review a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) *de novo*. *United States v. Corinthian Colleges*, 655 F.3d 984, 991 (9th Cir. 2011). We review a district court's entry of judgment under Federal Rule of Civil Procedure 12(c) *de novo*. *Yakima Valley Mem'l Hosp. v. Washington State Dept. of Health*, 654 F.3d 919, 925 (9th Cir. 2011).

## III

First we examine whether Plaintiffs' claims against the repealed 2011 and 2012 versions of the LCFS are moot. The district court held that, in light of a discussion of mootness in a footnote in *Rocky Mountain I*, the repeal or amendment of older versions of the LCFS did not render Plaintiffs' claims against those regulations moot. Whatever the status

of Plaintiffs' claims in 2013, we now hold that no effective relief can be provided for these claims, and that they are now moot. We vacate the district court's judgment on them and remand with directions to dismiss them as moot.

As noted in *Rocky Mountain I*, a case is moot "only when it is impossible for a court to grant any effectual relief." *Rocky Mountain I*, 730 F.3d at 1097 n.12 (quoting *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013)). However, "the Supreme Court and our court have repeatedly held that a case is moot when the challenged statute is repealed, expires, or is amended to remove the challenged language." *Log Cabin Republicans v. United States*, 658 F.3d 1162, 1166 (9th Cir. 2011). Where there is nothing left of a challenged law to enjoin or declare illegal, further judicial action would necessarily be advisory and in violation of the limitations of Article III. *See, e.g.*, *id.* at 1165–66 (describing this doctrine as arising out of the case or controversy requirements of Article III); *Students for a Conservative America v. Greenwood*, 378 F.3d 1129, 1131 (9th Cir. 2004) ("This case is moot . . . because the challenged rules have been changed and will not apply in future elections."); *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1514 (9th Cir. 1994) ("Declaratory relief is unavailable where [a] claim is otherwise moot . . . ."). To test whether subsequent developments have mooted a suit, we ask whether the claim could have been brought "in light of the . . . statute as it now stands." *Hall v. Beals*, 396 U.S. 45, 48 (1969).

Plaintiffs' claims arising from the 2011 and 2012 versions of the LCFS fail this test. The laws challenged are no longer in effect, Plaintiffs' obligations under them have been discharged, and it is not possible for the Court to grant any effectual relief, as the 2011 and 2012 versions of the

LCFS have been repealed.  As such, Plaintiffs are in the same boat as the plaintiffs in *Log Cabin Republicans*, in which we said that "[i]f Log Cabin filed suit today seeking a declaration that section 654 is unconstitutional or an injunction against its application (or both), there would be no Article III controversy because there is no section 654." 658 F.3d at 1166.

*Rocky Mountain I* did not hold otherwise when it briefly considered whether the 2012 amendments had made the Plaintiffs' 2013 challenge to the crude oil provisions of the 2011 LCFS moot.  The court held that the amendments had not mooted Plaintiffs' claims, because "[c]redits awarded based on [carbon intensity values calculated under the challenged 2011 Provisions] will carry forward to subsequent years and may be used by a regulated party" and "[t]he propriety of the scheme under which those credits were distributed remains a live controversy." *Rocky Mountain I*, 730 F.3d at 1097 n.12.  This statement reflected the fact that, as we were deciding this issue, the 2011 LCFS, as partially amended in 2012, was good law and could have been subject to any number of declaratory or injunctive remedies.  Although it is true that credits awarded under prior versions of the LCFS could have future effects, it is no longer true that the scheme under which those credits were distributed remains a live controversy and challenges to it can no longer be brought, as the 2011 and 2012 versions have been repealed.  If the present LCFS inherited any constitutional infirmities from its predecessor, these must be part of Plaintiffs' challenge to the law as it currently stands.

Plaintiffs argued to the district court that they could seek "the adjustment of the carry-forward credits calculated under the prior version of the LCFS" as a remedy to save these challenges from mootness.  For good reason, Plaintiffs have

since abandoned this claim. As the district court correctly held, any such remedy would be barred for Plaintiff associations by a lack of associational standing, and barred for all Plaintiffs by the Eleventh Amendment. In order to try to compensate parties for unconstitutionally low credits or unconstitutionally high deficits awarded under prior versions of the LCFS, the court would have to determine how each party changed its behavior in response and how much those changes cost each party, determinations that would be impossible without "the participation of individual members in the lawsuit." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Com'n*, 432 U.S. 333, 343 (1977)). Moreover, any such relief could only be compensation for a state's past violation of law, which is barred by the Eleventh Amendment. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 105–06 (1984) ("[A]n award of retroactive relief necessarily falls afoul of the Eleventh Amendment."); *see also Porter v. Jones*, 319 F.3d 483, 491 n.7 (9th Cir. 2003) ("[P]laintiff may not couch in terms of injunctive and declaratory relief a compensatory, backward-looking remedy.").[5]

The district court's judgment on all of Plaintiffs' challenges to the 2011 and 2012 versions of the LCFS is **VACATED** with instructions to **DISMISS** those claims on remand. *See Log Cabin Republicans*, 658 F.3d at 1167 (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39

---

[5] Assuming for sake of argument that we are incorrect in our conclusion on mootness, and that the challenges by Plaintiffs to the 2011 and 2012 versions of the LCFS are not moot, then we would affirm as against those challenges for the reasons stated by the majority in *Rocky Mountain I*.

(1950)) (describing this procedure as "the 'established' practice").

## IV

Plaintiffs assert that the 2015 LCFS regulates extraterritorially, having amended their claims to include the 2015 LCFS and an allegation that the LCFS violates the federal structure of the Constitution in addition to the Commerce Clause. The district court granted Defendants' motion to dismiss on the basis that this claim is precluded by *Rocky Mountain I*. Plaintiffs contend that their appeals in the current case include a claim based on the federal structure of the Constitution that was not decided in *Rocky Mountain I*. We hold that Plaintiffs' extraterritoriality claims against the 2015 LCFS are precluded by the law of the case and by our recent circuit precedent in *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903 (9th Cir. 2018) (hereinafter *O'Keeffe*).[6]

## A

The law of the case doctrine generally precludes reconsideration of "an issue that has already been decided by the same court, or a higher court in the identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (quoting *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993)). In a circumstance like this, "a judgment of reversal

---

[6] On September 12, 2018, the Plaintiffs-Appellants filed a Motion to Dispense with Oral Argument, asserting that argument was not needed because to the extent the appeal raised issues not governed by the rulings in *Rocky Mountain I*, *O'Keeffe* resolved those issues. Plaintiffs said they disagreed with that ruling, but that it was binding on the court in this case. Our panel denied the motion on September 14, 2018, and we address all pertinent issues in this opinion.

by an appellate court is an adjudication only of matters expressly discussed and decided, which become the law of the case in further proceedings on remand and re-appeal." *Hansen & Rowland v. C.F. Lytle Co.*, 167 F.2d 998, 999 (9th Cir. 1948).  To show that an issue is not controlled by the law of the case, parties must show that it was not "decided explicitly or by necessary implication" by a prior decision. *United States v. Garvia-Beltran*, 443 F.3d 1126, 1129 (9th Cir. 2006) (quoting *Liberty Mut. Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir. 1982)).  As a prudential rather than jurisdictional doctrine, the law of the case doctrine does not apply "if the court is convinced that its prior decision is clearly erroneous and would work a manifest injustice." *Pepper v. United States*, 562 U.S. 476, 506–07 (2011) (internal quotation marks and brackets omitted) (quoting *Agostini v. Felton*, 521 U.S. 203, 236 (1997)).

*Rocky Mountain I* expressly decided Plaintiffs' extraterritoriality claims against the 2011 and 2012 versions of the LCFS.  Because these claims are now moot, the only extraterritoriality claims remaining are those against the 2015 LCFS.  Strictly speaking, *Rocky Mountain I* did not, for obvious reasons, address any claims Plaintiffs may have had against the 2015 LCFS.  Practically speaking, however, the controlling substance at the crux of the case has not changed.  The 2015 LCFS still uses lifecycle analysis to assign credits and deficits, and although some details have changed, Plaintiffs do not and cannot explain how their extraterritoriality claims under the Commerce Clause function differently against the new version of the regulation.  Moreover, by deciding that California's use of lifecycle analysis "does not control the production or sale" of out-of-state fuel and that "California may regulate with reference to local harms, structuring its internal markets to set incentives for firms to produce less harmful products for

sale in California," *Rocky Mountain I* necessarily implied that an extraterritoriality challenge to a functionally identical regulation would fail. *Rocky Mountain I*, 730 F.3d at 1104.

We are not convinced that our decision in *Rocky Mountain I* is "clearly erroneous" such that its application "would work a manifest injustice." *Pepper*, 562 U.S. at 506–07. *Rocky Mountain I* examined the LCFS under the test provided by *Healy*, which holds that a regulation is impermissibly extraterritorial when "the practical effect of the regulation is to control conduct beyond the boundary of the state." *Rocky Mountain I*, 730 F.3d at 1101 (citing *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)). By holding that California may "regulate with reference to local harms, structuring its internal markets to set incentives for firms to produce less harmful products for sale in California," *Rocky Mountain I* properly respected the separate sovereignty of the several states. *Id.* at 1104.

*Rocky Mountain I* followed a well-worn path of precedent. States may seek to influence which products are sold in-state, distinguishing impermissible statutes that "regulate out-of-state parties directly" from those that "regulate[] contractual relationships in which at least one party is located in [the regulating state]." *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1224 (9th Cir. 2003). This is true even where the characteristics of the products at market are not at issue. *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 947–52 (9th Cir. 2013) (holding that a ban on selling *foie gras* created by force-feeding did not discriminate against or regulate out-of-state commerce); *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003) (holding that Maine may impose regulatory burdens on drug manufacturers who do not have a rebate agreement with the

state).  The Commerce Clause also does not treat regulations that have upstream effects on how sellers who sell to California buyers produce their goods as being necessarily extraterritorial.  *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 472 (1981); *Exxon Corp. v. Maryland*, 437 U.S. 117, 125–28 (1978).  And as *C&A Carbone, Inc. v. Town of Clarkstown* emphasized, local governments are empowered to issue "uniform safety regulations" which "would ensure that competitors . . . do not underprice the market by cutting corners on environmental safety." 511 U.S. 383, 393 (1994).  In other words, subjecting both in and out-of-jurisdiction entities to the same regulatory scheme to make sure that out-of-jurisdiction entities are subject to consistent environmental standards is a traditional use of the State's police power; it is not an extension of "police power beyond its jurisdictional bounds."  *Id.*  The LCFS helps California and its citizens by ensuring that out-of-state fuels do not benefit in Californian markets by "cutting corners" and not being subject to California's regulations on the resulting greenhouse gases.

*Rocky Mountain I* reflects the commonplace proposition that states may regulate to minimize the in-state harm caused by products sold in-state, a central aspect of the state sovereignty protected by the Constitution.  *See Clover Leaf Creamery Co.*, 449 U.S. at 471–74; *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1324 (9th Cir. 2015) (en banc) (commenting that *Rocky Mountain I* "concerned state law[] that regulated *in-state conduct* with allegedly significant out-of-state practical effects"); Brannon P. Denning, *Extraterritoriality and the Dormant Commerce Clause: A Doctrinal Post-Mortem*, 73 La. L. Rev. 979, 998–99 (2013) (noting that a contrary expansive view of the *Healy* doctrine "could have become a significant restriction on state regulatory power" if the Court had adopted it).  The

LCFS does this without crossing into impermissible inter-state regulation. *See Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982) (holding an state statute conflicted with the Commerce Clause because it regulated transactions in other states); *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 653–54 (7th Cir. 1995) (holding a state statute violated the Commerce Clause because it effectively required other states to adopt similar regulations); *Healy*, 491 U.S. at 331–39 (holding that a state statute violated the Commerce Clause because it had the practical effect of establishing scale of prices for use in other states); *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986) (same); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935) (same).

Finally, we squarely reject Plaintiff-Appellants' arguments that California's interest in the LCFS is merely a concern for the environmental harms that are properly subject to the police power of other states rather than of California. As we held in *Rocky Mountain I*, the LCFS was enacted pursuant to California's view that "[g]lobal warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California." Cal. Health & Safety Code § 38501(a). California did not enact the LCFS because it thinks that it is the state that knows how best to protect Iowa's farms, Maine's fisheries, or Michigan's lakes. California's interest in the lifecycle of the fuels used by its consumers arises from a concern for the effects of the production and use of these fuels on California's own air quality, snowpack, and coastline. Here, the regulated parties, the regulated transactions, and the harms California intended to prevent are all within the state's borders, making the LCFS a classic exercise of police power. We cannot say that California is doing anything other than legislating "with reference to its

own jurisdiction" in promulgating the LCFS.  *Bonaparte v. Appeal Tax Court of Balt.*, 104 U.S. 592, 594 (1881).

## B

Having previously lost on their Commerce Clause argument in *Rocky Mountain I*, Plaintiffs now advance their new constitutional argument, contending that their claims are based on the "federal structure of the Constitution" and are not controlled by *Rocky Mountain I*.  Plaintiffs have not identified which constitutional provisions or doctrine outside the Commerce Clause they believe govern their structural federalism claims, if any do.  However, our panel need not linger on whether the Constitution could support such a claim, because we are bound by recent circuit precedent that has settled whether a program very similar to the LCFS is inconsistent with the structure of the Constitution.  *See O'Keeffe*, 903 F.3d at 916–17.  The *O'Keeffe* court held that "irrespective of its constitutional basis, any such claim is necessarily contingent upon a finding that the [regulating state's] program regulates and attempts to control conduct that occurs in other states."  *Id.* (quoting *Goldstene*, 2014 WL 7004725, at *13–14).  As discussed above, we settled this precise question for the LCFS in *Rocky Mountain I*, and  *O'Keeffe* is not materially distinguishable from our current case.

There is simply no reason to search beyond the Commerce Clause for the Constitution's limits on the ability of states to affect interstate commerce.  While the Supreme Court has frequently instructed us on the general principles that "all States enjoy equal sovereignty," *Shelby County, Ala. v. Holder*, 570 U.S. 529, 534 (2013), and that states may not "regulate and control activities wholly beyond [their] boundaries," *Watson v. Emp'rs Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954), Commerce Clause jurisprudence is

the relevant application of those general principles to this context. The states, in forming the Union, "reserve[d] . . . a substantial portion of the Nation's primary sovereignty," and, because of this, constitutional restrictions on the police power of the states should not be lightly inferred. *Alden v. Maine*, 527 U.S. 706, 714 (1999). Our federalism doctrine already has one "quagmire" of doctrine, independent of the constitutional text, concerned with the effects of state regulation on interstate commerce. *West Lynn Creamery v. Healy*, 512 U.S. 186, 210 (1994) (Scalia, J., concurring). We should decline to create another.

The district court's decision as to Plaintiffs' extraterritoriality claims against the 2015 LCFS is **AFFIRMED**.

**V**

Plaintiffs contend for a second time that the LCFS facially discriminates against interstate commerce in its treatment of ethanol and crude oil, having amended their claims to include the 2015 LCFS. The district court concluded that Plaintiffs' claims against the 2015 LCFS should be dismissed based on *Rocky Mountain I*, and we agree.

*Rocky Mountain I* rejected facial discrimination challenges to the 2011 LCFS, holding that the "lifecycle analysis used by CARB, including the specific factors to which Plaintiffs object, does not discriminate against out-of-state commerce" and that CARB's decision to distinguish between different fuels reflected its "expert regulatory judgment" in aiming to produce "accurate carbon intensity values." 730 F.3d at 1093, 1096. These features remain in the 2015 LCFS, and rather than contending that the new law discriminates in some different way, Plaintiffs concede that

their facial discrimination challenges are based on the same premises. In fact, these claims have only been weakened by intervening regulatory developments. The original LCFS appealed to default pathways with regional characteristics, which were a major source of the facial discrimination claims in *Rocky Mountain I*. *See id.* at 1096. The 2015 LCFS eliminates the regional pathways and gives every alternative fuel an individualized assessment, making no default assumptions based on region of origin. 2015 LCFS § 95488(b), (c). It is not surprising then that Plaintiffs concede that their facial discrimination claims are controlled by *Rocky Mountain I*.

Because ruling in favor of Plaintiffs on their facial discrimination claim would require rejecting *Rocky Mountain I* on issues it expressly reached and decided, the law of the case prevents us from endorsing Plaintiffs' claims against the 2015 LCFS unless we believe that "[our] prior decision is clearly erroneous and would work a manifest injustice." *Pepper*, 562 U.S. at 506–07. As we do not, we affirm the district court's dismissal.

As *Rocky Mountain I* reflects, the Commerce Clause respects both the concerns of the national marketplace and the central value of local autonomy in our federal system. *See Rocky Mountain I*, 730 F.3d at 1087. These principles require us to take into account the potential indirect effects of a state's regulation of in-state activities insofar as they may affect out-of-state commerce. However, the lens through which we view this analysis must reflect the fact that a state's ability to control its internal markets and combat local harms is squarely within its traditional police power. Our Commerce Clause jurisprudence reflects the fact that "the Framers' distrust of economic Balkanization was limited by their federalism favoring a degree of local

autonomy." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (examining the history and rationale for the Commerce Clause). *Rocky Mountain I* was correct to hold that the LCFS was permissible local regulation under this balance of considerations.

State autonomy in the regulation of economic and social affairs is central to our system because of the recognized role states have as laboratories, trying "novel social and economic experiments without risk to the rest of the country." *Rocky Mountain I*, 730 F.3d at 1087 (citing *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)); *see also Reeves, Inc. v. Stake*, 447 U.S. 429, 441 (1980) (arguing that in light of State experimentation in policy "[a] healthy regard for federalism and good government renders us reluctant" to strike down a state program under the dormant Commerce Clause). Because any meaningful regulation of in-state commerce may have indirect but significant interstate impacts, we should be reluctant to subject states to unwarranted scrutiny under the Commerce Clause for fear that we will frustrate "the theory and utility of our federalism" by restricting the ability of the states to "perform their role as laboratories for experimentation . . . where the best solution is far from clear." *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring).

California has attempted to address a vitally important environmental issue with vast potential consequences. *O'Keeffe*, 903 F.3d at 913 (citing *Massachusetts v. EPA*, 549 U.S. 497, 522–23 (2007)) (recognizing that "[i]t is well settled that states have a legitimate interest in combating the adverse effects of climate change on their residents."). It seems clear beyond dispute that potential climate change poses one of the most difficult challenges facing all

civilizations worldwide for the twenty-first century. By recognizing emissions that occur throughout the lifecycle of different fuels, California has offered a potential solution to the perverse incentives that would otherwise undermine any attempt to assess and regulate the carbon impact of different fuels. *See Rocky Mountain I*, 730 F.3d 1081. This experiment cannot succeed without the ability to differentiate the different production processes and power generation that are used to produce those fuels. Moreover, the value of California's experimentation is reinforced by the fact that other states can and will follow suit by using any lawful procedure that proves effective as a model. That is what happened in the Oregon Clean Fuels Program. *Id.* at 907–10.

The Constitution does not require California to shut its eyes to the fact that some ethanol is produced with coal and other ethanol is produced with natural gas because these kinds of energy production are not evenly dispersed across the country or because other states have not chosen to regulate the production of greenhouse gases. If the states are to remain a source of "innovative and far-reaching statutes" that "supplemen[t] national standards," they must be permitted to submit the goods and services sold within their borders to certain environmental standards without having thereby discriminated against interstate commerce from states with lower local standards. *FERC v. Mississippi*, 456 U.S. 742, 789 (1982) (O'Connor, J., concurring in part and dissenting in part).

The district court's decision as to Plaintiffs' facial discrimination claims against the 2015 LCFS is **AFFIRMED**.

# VI

We previously remanded to the district court in *Rocky Mountain I* on the Plaintiffs' claim that the LCFS purposefully discriminates against out-of-state ethanol. The district court dismissed this claim, finding that "Plaintiffs ma[de] no meaningful effort to differentiate the factual and legal bases of their claims concerning the Original LCFS's ethanol provisions . . . and the bases of their pending claim that the 2015 LCFS's ethanol provisions have a discriminatory purpose." We agree and affirm.

In *Rocky Mountain I*, we left open the possibility that Plaintiffs might have been able to show that the LCFS's treatment of carbon intensity, although it reflected facially permissible differences between different kinds of fuels, was actually enacted to prop up local fuel interests. Rather than take advantage of the opportunity to develop this claim on remand, however, Plaintiffs rely on the same basic set of facts and alleged statements of bias that we heard in *Rocky Mountain I*. As the district court found, "Plaintiffs have not pointed to any portion of the LCFS's legislative history that the Ninth Circuit did not consider."

Although we declined to foreclose Plaintiffs' purposeful discrimination claim, the district court is correct that "the logic and *record* underlying all of Plaintiffs' claims against the ethanol provisions . . . has not changed." The only new material is a 2009 CARB press release that the district court correctly held was a permissible "economic defense of a [regulation] genuinely proposed for environmental reasons." *Rocky Mountain I*, 730 F.3d at 1100 n.13 (citing *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) ("We will not invalidate a state statute under the Equal Protection Clause merely because some legislators sought to

obtain votes for the measure on the basis of its beneficial side effects on state industry.")).

As we noted in *Rocky Mountain I*, "[t]he party challenging a regulation bears the burden of establishing that a challenged regulation has a discriminatory purpose or effect under the Commerce Clause." 730 F.3d at 1097 (citing *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). This burden is all that much higher to meet in the face of our holding that the structure of the LCFS does not show evidence of discrimination. Under the LCFS, the relative fate of in-state and out-of-state entities depends entirely on the environmental properties of different fuel production and transport processes. If the Midwest were to undergo a green revolution in its energy production, the LCFS would act as a competitive drag on California energy producers. In fact, *Rocky Mountain I* recognized that it had already done so with respect to portions of the market. *See, e.g.*, *Rocky Mountain I*, 730 F.3d at 1084 ("The individualized pathway with the lowest carbon intensity was achieved by a Midwest producer . . .[and] [t]he default pathway with the lowest carbon intensity is . . . for Brazilian sugarcane ethanol . . . .").

In light of these facts about the LCFS's design, Plaintiffs do not meet their burden of showing a discriminatory purpose. Plaintiffs do not advance any evidence concerning the purpose of the new regulation, the only law now subject to challenge. Plaintiffs' arguments rely primarily on California's motivations for passing the different versions of the LCFS that were applicable in 2009 and 2010. This is fatal to their case. In both its design and its legislative justifications, the LCFS is a regulation aimed at salient environmental differences between different types of fuels, differences which genuinely reflect legitimate state interests. We reject the bald suggestion that the California LCFS is

disguised economic protectionism.  Instead, we reaffirm the conclusions that were set forth in part VI of *Rocky Mountain I* because those conclusions remain pertinent to the claims now presented:

> The California legislature has determined that the state faces tremendous risks from climate change.  With its long coastlines vulnerable to rising waters, large population that needs food and water, sizable deserts that can expand with sustained increased heat, and vast forests that may become tinderboxes with too little rain, California is uniquely vulnerable to the perils of global warming. The California legislature determined that GHG emissions from the production and distribution of transportation fuels contribute to this risk, and that those emissions are caused by the in-state consumption of fuels. Whether or not one agrees with the science underlying those views, those determinations are permissible ones for the legislature to make, and the Supreme Court has recognized that these risks constitute local threats.  *See Massachusetts*, 549 U.S. at 522.

> To combat these risks, the California legislature and its regulatory arm CARB chose to institute a market-based solution that recognizes the costs of harmful carbon emissions.  For any such system to work, two conditions must be met.  First, the market must have full and accurate information about the real extent of GHG emissions. Second, the compliance costs of entering the

market must not be so great as to prevent participation. Plaintiffs attack the lifecycle analysis and default pathways that fulfill these conditions, relying on archaic formalism to prevent action against a new type of harm. It has been sagely observed by Justice Jackson that the constitutional Bill of Rights is not a "suicide pact." *See Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting). Nor is the dormant Commerce Clause a blindfold. It does not invalidate by strict scrutiny state laws or regulations that incorporate state boundaries for good and non-discriminatory reason. It does not require that reality be ignored in lawmaking.

California should be encouraged to continue and to expand its efforts to find a workable solution to lower carbon emissions, or to slow their rise. If no such solution is found, California residents and people worldwide will suffer great harm. We will not at the outset block California from developing this innovative, nondiscriminatory regulation to impede global warming. If the Fuel Standard works, encouraging the development of alternative fuels by those who would like to reach the California market, it will help ease California's climate risks and inform other states as they attempt to confront similar challenges.

730 F.3d at 1106–07.

These potential risks to the people living in California have only intensified in the past several years.  Consider that in the past year California saw its forest fires threat increase in scope, intensity, duration, and damages, caused in part by the extensive droughts throughout the state. *See, e.g.*, Madison Park, *California Fire Explodes in Size, Is Now Largest in State History*, CNN.com (Aug. 7, 2018), https://www.cnn.com/2018/08/06/us/california-fires/index.html.  California also saw more powerful storms hitting its coastlines. *See, e.g.*, Rong-Gong Lin II, *Hurricane Rosa Poses Risk of Flash Floods to Eastern California, Las Vegas, Arizona*, LATimes.com (Sep. 29, 2018), http://www.latimes.com/local/lanow/la-me-ln-rain-20180929-story.html.

The district court's decision as to Plaintiffs' purpose and effect discrimination claims against the 2015 LCFS is **AFFIRMED**.

## VII

The district court's decision as to the Plaintiffs' challenges to the 2015 LCFS is **AFFIRMED**.  We **VACATE** its judgment as to the challenges to the 2011 and 2012 versions of the LCFS and **REMAND** with instructions to dismiss them as moot.

Costs are awarded to the Defendants.